Shawn William ERNST, Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellee.

No. 2002–SC–1088–MR.

Supreme Court of Kentucky.

April 21, 2005.

Donna L. Boyce, Appellate Branch Manager, Department of Public Advocacy, Julie Namkin, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, George G. Seelig, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

COOPER, Justice.

A Boone Circuit Court jury convicted Appellant, Shawn William Ernst, of kidnapping and murdering Sandra Kay Roberts. He was sentenced to life in prison for the murder and to life in prison without benefit of probation or parole for the kidnapping. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting eight claims of reversible error, *viz:* (1) insufficiency of the indictment for capital kidnapping; (2) admission of hearsay evidence; (3) admission of unduly prejudicial photographs and videotape of the victim's body; (4) admission of improper character evidence; (5) admission of victim impact evidence during the guilt phase of the trial; (6) improper cross-examination of Appellant by the prosecutor; (7) failure of the jury to find an essential element of capital kidnapping; and (8) imposition of capital punishment absent proof of a proper aggravating circumstance. Finding no reversible error, we affirm.

\* \* \*

Roberts and her sister, Betty Davidson, resided together in a house in Florence, Kentucky, that they rented from Roberts's ex-husband. Neither was employed and both drew social security disability benefits. For additional income, they subleased a room in their home to Donald Durbin. On March 18, 2000, Roberts subleased another room to Appellant. At that time, Davidson was an inpatient at a rehabilitation clinic on the campus of the St. Elizabeth's Medical Center. Roberts visited Davidson at the clinic virtually every day and also talked to her on the telephone several times a day.

Appellant's fiancée, Denise Arrington, had moved to Texas and a dispute arose between Appellant and Roberts concerning a $145.00 long-distance telephone bill that Appellant incurred without Roberts's permission. The disagreement escalated, and by the weekend of April 1–2, 2000, Roberts decided to evict Appellant from her residence and confiscated his television and videocassette recorder (VCR) as collateral for the payment of the telephone bill. She began locking her purse and Davidson's purse in the trunk of her automobile. On the evening of April 2, 2000, while Appellant was engaged in another long-distance telephone conversation with Arrington, Roberts picked up an extension phone and berated Appellant about incurring long-distance telephone bills.

The following day, several members of Roberts's family attempted to contact her to no avail. They went to her residence where they noticed several things out of place, including that Roberts's dentures were still in a cup beside her bed even

though her automobile was not in the garage. They also found Appellant's room completely empty of his belongings. They reported Roberts as a missing person to the Florence Police Department and identified Appellant as a possible suspect. In the early morning of April 4, 2000, police officers found Appellant's automobile parked behind his place of employment, the "Just For Fun" arcade in Dayton, Kentucky, and noted that it was filled with clothing and other personal belongings, including a television and a VCR. Unable to locate anyone inside the arcade, the officers impounded the vehicle. Police officers also found Roberts's vehicle in the parking garage of St. Elizabeth's Hospital, and a hospital employee found Roberts's and Davidson's purses in a trash receptacle inside the hospital.

Florence Police Department detectives interviewed Appellant later in the day on April 4, 2000. Appellant initially denied any involvement in Roberts's disappearance; but upon being advised (as a ruse) that a security camera at St. Elizabeth's had filmed him exiting Roberts's vehicle, Appellant responded, "I goofed," and told the detectives where they could find Roberts's body. He gave the detectives a statement in which he claimed that Roberts had collapsed on the floor of his bedroom during an argument over a telephone bill and that he had panicked and driven her body to property in Gallatin County owned by relatives of Mark Crossen, a coworker of Appellant's, where he set it afire and attempted to conceal it under some debris.

The police found Roberts's dead and partially burned body at a salvage yard in Gallatin County. An autopsy revealed that she died as a result of asphyxia due to a compression injury to her neck. Because there was no soot in Roberts's lungs, the medical examiner concluded that she died before being set afire. The autopsy also revealed an elevated level of carbon monoxide in Roberts's blood, indicating she was exposed to carbon monoxide gas while still alive.

At trial, Appellant testified that Roberts came to his bedroom on the evening of April 2, 2000, yelling and swinging a vase at him. The argument became physical, and, according to Appellant, he accidentally choked Roberts while trying to push her away. Believing he had killed her and fearing that he would be arrested, Appellant loaded the body into the trunk of his car and drove it to Gallatin County where he set it afire. The Commonwealth presented evidence of prior statements by Appellant that conflicted with his trial testimony. Arrington testified that Appellant told her several different versions of how he killed Roberts. Richard Siegel, a jailhouse informant, testified that Appellant told him that he shook Roberts to death during an argument over a telephone bill. Samuel O'Koon, another jailhouse informant, testified that Appellant told him that he confronted Roberts after she interrupted his telephone conversation with Arrington, that he choked her, and that he believed she was dead because she urinated on the bed while he was choking her. Starrett Palmer, another cellmate, testified that he overheard the conversation between Appellant and O'Koon.

## I. SUFFICIENCY OF THE INDICTMENT.

Appellant asserts that the indictment for capital kidnapping failed to specify that the victim was not released alive, thus depriving him of his rights to a proper grand jury indictment and to due process under the United States and Kentucky Constitutions. For the same reason, he asserts that the trial court did not acquire jurisdiction to try him for capital kidnapping. Appellant concedes that his

trial counsel did not object to this alleged defect, RCr 8.18, but seeks review for palpable error, RCr 10.26, and points out that absence of jurisdiction can be raised at any time. *Gaither v. Commonwealth,* 963 S.W.2d 621, 622 (Ky.1997). The body of the indictment recited:

> That on or about the 2nd or 3rd day of April, 2000, in this county and state, the above-named defendant committed the offense of Kidnapping in violation of K.R.S. 509.040 (UOR Code No. 10060), a Capital Offense punishable by imprisonment for not less than twenty (20) years in the penitentiary up to and including death, in that he unlawfully restrained Sandra Kay Roberts when his intent was to accomplish or to advance the commission of a felony offense or to inflict bodily injury or to terrorize the victim.

To charge and convict a defendant of capital kidnapping, the Commonwealth must prove, in addition to the elements required for Class B kidnapping, KRS 509.040(1), that the victim was not released alive or subsequently died as a result of the kidnapping. KRS 509.040(2). The victim's death is an essential element of capital kidnapping. *See Soto v. Commonwealth,* 139 S.W.3d 827, 841 (Ky.2004). As such, Appellant argues that it was palpable error for the trial court to try him for capital kidnapping based on an indictment that did not recite this element of the offense. We conclude that the indictment was sufficient in all respects.

■ Appellant argues that under the Fifth and Sixth Amendments to the United States Constitution, "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be *charged in an indictment,* submitted to a jury, and

proven beyond a reasonable doubt." *Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 1224 n. 6, 143 L.Ed.2d 311 (1999) (emphasis added). However, a defendant's substantive due process rights, under the Fourteenth Amendment, are satisfied when he is "informed of the acts alleged as criminal and the crime with which he is charged." *Malone v. Commonwealth,* 30 S.W.3d 180, 183 (Ky.2000). *See also Wheeler v. Commonwealth,* 121 S.W.3d 173, 185 (Ky.2003) ("To the extent that *Jones* applies in any regard, due process has been fully satisfied here [by an indictment sufficient to apprise the accused of the charge against him]."). Federal law, which was applied in *Jones,* requires an indictment to set forth all of the elements of an offense. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). As we recognized in *Soto,* however, "the Fourteenth Amendment has never been construed to incorporate against the states 'the Fifth Amendment right to presentment or indictment by a Grand Jury.'" *Soto,* 139 S.W.3d at 842 (quoting *Apprendi v. New Jersey,* 530 U.S. 466, 477 n. 3, 120 S.Ct. 2348, 2355 n. 3, 147 L.Ed.2d 435 (2000)). Appellant's argument that the Equal Protection Clause of the Fourteenth Amendment requires Kentucky's grand jury right to be coextensive with the federal grand jury right is meritless. *See Hurtado v. California,* 110 U.S. 516, 534–35, 4 S.Ct. 111, 120, 28 L.Ed. 232 (1884) (Grand Jury Clause of Fifth Amendment not applicable to the states).[1]

■ An indictment is sufficient under Kentucky law if it contains "a plain, concise and definite statement of the essential facts constituting the specific offense with

---

1. Appellant's reliance on *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), is misplaced. *Rose* merely stands for the axiomatic proposition that a state choosing to extend the right of indictment by grand jury cannot then allow racial discrimination to infiltrate the grand jury selection process. *Id.* at 557 n. 7, 99 S.Ct. at 3001 n. 7.

**752**

which the defendant is charged." RCr 6.10(2). The indictment need not detail the essential elements of the charged crime, so long as it "fairly informs the accused of the nature of the charged crime ... and 'if it informs the accused of the specific offense with which he is charged and does not mislead him.'" *Thomas v. Commonwealth,* 931 S.W.2d 446, 449 (Ky. 1996) (quoting *Wylie v. Commonwealth,* 556 S.W.2d 1, 2 (Ky.1977)). Finally, although Appellant argues that the indictment did not set forth the essential elements of the capital kidnapping offense, we also note that the indictment is not required to recite the aggravating circumstance necessary to seek capital punishment so long as the Commonwealth satisfies the notice requirement in KRS 532.025(1)(a). *Bratcher v. Commonwealth,* 151 S.W.3d 332, 356 (Ky.2004); *Soto,* 139 S.W.3d at 841–43.

The indictment in this case passed muster under these standards. The body of the indictment referred to the charge of kidnapping as "a Capital Offense punishable by imprisonment for not less than twenty (20) years in the penitentiary up to and including death ...." Even if this language were deemed insufficient to inform Appellant of the nature of the charged offense, Appellant certainly received sufficient notice from the caption of the indictment, which read: "Count I: Kidnapping, K.R.S. 509.040, (UOR Code No. 10060), Capital Offense (Not less than 20 years) (Victim Not Released Alive)." The caption informed Appellant that he was being charged with Capital Kidnapping and informed him of the specific statutory circumstance upon which the Commonwealth was relying for enhancement to a capital offense, *i.e.,* "victim not released alive." This is easily a case where "the language of the indictment, coupled with the applicable statute, unmistakably accomplishes this end result [of apprising the accused with reasonable certainty of the

offense charged]." *Runyon v. Commonwealth,* 393 S.W.2d 877, 880 (Ky.1965). Because the indictment gave Appellant sufficient notice of the acts alleged as criminal and the crime charged, it satisfied his substantive due process rights. *Malone,* 30 S.W.3d at 183.

Our conclusion that the indictment was sufficient to charge Appellant with capital kidnapping moots Appellant's claim that the trial court never acquired subject matter jurisdiction to try him for capital kidnapping.

## II. HEARSAY.

■ Appellant asserts that the trial court erroneously permitted three of the Commonwealth's witnesses to testify to out-of-court statements made to them by Roberts. *See generally Moseley v. Commonwealth,* 960 S.W.2d 460 (Ky.1997). Whether a particular statement is admissible under a hearsay exception depends on the circumstances of each case and is a preliminary question of fact to be determined under KRE 104(a). *Noel v. Commonwealth,* 76 S.W.3d 923, 926 (Ky.2002). The trial court's findings of fact under KRE 104(a) will not be disturbed unless clearly erroneous. *Young v. Commonwealth,* 50 S.W.3d 148, 167 (Ky.2001). The Commonwealth asserts that each of Roberts's statements fell within an exception to the hearsay rule defined in KRE 803(1), (2), or (3).

### A. State of Mind: KRE 803(3).

■ At trial, the Commonwealth questioned Sharon McNay, Roberts's younger sister, about the circumstances under which Appellant came to reside in Roberts's home. When asked whether Roberts rented a room to Appellant, McNay testified that "she did, she did not want to." The trial court sustained Appellant's objection to this statement. McNay then

testified that in subsequent conversations, Roberts told her that she wanted Appellant to move out of her house. Betty Davidson, Roberts's older sister, related a conversation she had with Roberts on Saturday, April 1, 2002, in which Roberts told her that she intended to have Appellant evicted from their home.[2]

Michelle Roberts, the victim's daughter, testified that when Appellant expressed interest in renting the room, Roberts told Michelle that she would not rent the room to Appellant because of his lack of money. According to Michelle, Roberts subsequently changed her mind and rented the room to Appellant, telling Michelle, "I feel sorry for him, and he keeps calling." Michelle then testified that on Saturday, April 1, 2000, Roberts told her that she would go to the courthouse the following Monday morning to have Appellant evicted. That same day, when Roberts learned of the $145.00 in charges on her telephone bill, she expressed to Michelle her concern as to her ability to pay it. Michelle also mentioned a conversation that occurred later that evening in which Roberts expressed concern over her ability to manage the situation when Davidson returned home from the rehabilitation center. Michelle stated that Roberts told her on April 1 that she was going to strip the sheets off Appellant's bed and not replace them. Finally, Michelle testified that after an argument with Appellant on the night of Sunday, April 2, 2000, Roberts again expressed her intention to go to the courthouse the next day and have Appellant evicted.

Each of these statements falls within KRE 803(3), the hearsay exception for "statement[s] of the declarant's then existing state of mind, emotion, ... (such as

intent, plan, ... mental feeling) ...." Roberts's statements of her intention to initiate eviction proceedings on Monday, April 3, 2000, cast light upon her future intentions as opposed to past events. *Crowe v. Commonwealth*, 38 S.W.3d 379, 383 (Ky.2001). The same analysis applies to Roberts's statement of her original intention not to rent a room to Appellant because of his lack of money, as well as the statement of her later intention to strip the sheets off of Appellant's bed. Roberts's statements to McNay that she wanted Appellant to move out of her house, and to her daughter that she was concerned about the telephone charges and the situation that would occur when Davidson returned home were also admissible under KRE 803(3). Each statement pertained to her mental or emotional state existing at the time the statement was made. *See Bray v. Commonwealth*, 68 S.W.3d 375, 381 (Ky.2002). Finally, Roberts's statement, "I feel sorry for [Appellant]," indicated a present emotion (sorrow) existing when the statement was made. Substantial evidence supported the trial court's findings that each of these statements fell within the state-of-mind exception to the hearsay rule, thus those findings were not clearly erroneous.

■ However, statements that meet the state-of-mind exception are still inadmissible unless the victim's state of mind is relevant. *Blair v. Commonwealth*, 144 S.W.3d 801, 805 (Ky.2004); *Bray*, 68 S.W.3d at 381–82. Before trial, Appellant claimed on separate occasions both that Roberts spontaneously collapsed and that he acted in self-defense; and then at trial, Appellant presented an account that varied between self-defense and accident. Rob-

---

**2.** Appellant complains that the prosecutor led Davidson through this testimony and that defense counsel objected at trial to this as leading questions. However, a review of the vid-

eotape of the trial belies this claim. Defense counsel clearly stated, "We have no objection if you want to lead her to the word [evicted]."

erts's mental state was relevant to prove the increasingly strained relations between Roberts and Appellant, tending to show a motive for murder, KRE 404(b)(1), thus refuting Appellant's claims that Roberts's death was either of internal origin (sudden collapse) or accidental (unintentional strangulation). "Relevancy is established by any showing of probativeness, however slight." *Springer v. Commonwealth*, 998 S.W.2d 439, 449 (Ky.1999). The trial court's finding that Roberts's state of mind was relevant was not clearly erroneous.

### B. Excited Utterances: KRE 803(2).

■ Michelle Roberts testified that on Saturday, April 1, 2000, in her presence, her mother called Cincinnati Bell Telephone Company to inquire about long-distance calls charged to her account, and that during the conversation she overheard her mother exclaim, "Oh my God!" The next night, April 2, 2000, Michelle called her mother and perceived that she was very upset. When Michelle asked her what was wrong, Roberts told Michelle that she had just had an argument with Appellant and that he had slammed the door on his way out of the house. Roberts explained that the argument occurred because she had locked Appellant's television and VCR in a bathroom in the house to induce Appellant to pay the telephone bill, but that he had refused to pay the bill because he needed the money for his car payment. Michelle then testified that she asked her mother, "How did it end?" and that Roberts responded that Appellant told her that she "better have the TV and VCR out of the bathroom when he got home," and slammed the door. Michelle testified that she advised her mother to

call the police but that Roberts told her "it wouldn't do any good because there was nothing they could do." According to Michelle, Roberts remained upset during the entire conversation, which lasted approximately ten minutes.

■ KRE 803(2) allows admission of hearsay statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The eight most significant criteria for determining whether a statement qualifies under KRE 803(2) are: (1) the lapse in time between the main act and the declaration; (2) the opportunity or likelihood of fabrication; (3) the inducement to fabrication; (4) the actual excitement of the declarant; (5) the place of the declaration; (6) the presence, in that place, of visible results of the act to which the utterance relates; (7) whether the utterance was made in response to a question; and (8) whether the declaration was against interest or self-serving. *Jarvis v. Commonwealth*, 960 S.W.2d 466, 470 (Ky.1998).

The testimony as to the "Oh my God" exclamation was not even hearsay, as it was not offered to establish its own truth. KRE 801(c). Even if that were not so, however, the exclamation, itself, was a self-proving excited utterance.

The April 2, 2000, telephone conversation took place shortly after a heated argument between Roberts and Appellant,[3] and Roberts remained at the place where the argument occurred when she made the utterances. Most importantly, Roberts remained upset from the argument throughout the ten-minute conversation, indicating

---

**3.** While the record does not indicate the exact amount of time that elapsed between the argument and the telephone conversation, a fair reading of Roberts's statements to Michelle supports a finding that very little time had passed. Where the declarant's excitement persists, federal courts have upheld the admission of statements that occurred even hours after the startling event as excited utterances. *See, e.g. United States v. Cruz*, 156 F.3d 22, 30 (1st Cir.1998); *United States v. Scarpa*, 913 F.2d 993, 1016–17 (2d Cir.1990).

no opportunity to reflect and falsify. *See Honaker v. Crutchfield,* 247 Ky. 495, 57 S.W.2d 502, 504 (1933) (" 'Spontaneity,' as distinguished from the mere matter of time, has come to be considered the determining factor [in the excited utterance analysis]."). It is not controlling that the declarations were in response to questioning by Michelle where, as here, the questions were brief and not suggestive, and the declarant remained agitated throughout the entire discussion. *See Estes v. Commonwealth,* 744 S.W.2d 421, 426 (Ky. 1987), *abrogated on other grounds by Slaven v. Commonwealth,* 962 S.W.2d 845, 851 (Ky.1997); *see also United States v. Iron Shell,* 633 F.2d 77, 85–86 (8th Cir.1980). The trial court's finding that Roberts's statements to Michelle during their telephone conversation were excited utterances was supported by substantial evidence, thus was not clearly erroneous.

### C. Present Sense Impression: KRE 803(1).

 At trial, Davidson related an incident in which Roberts called her on the telephone and told her that she (Roberts) had gone to the basement and was startled to find Appellant sitting in the basement in a lawn chair. Appellant objected on grounds of hearsay, not relevancy. Presumably, this evidence was offered to show that Appellant did not feel himself confined to that part of the house that Roberts had leased to him.

#### 1. Contemporaneity.

The present sense impression exception to the hearsay rule permits admission of a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." KRE 803(1). Although the rule says "immediately

thereafter," KRE 803(1) is identical to Federal Rule of Evidence (FRE) 803(1); and the Advisory Committee's Note to that rule clarifies that the substitution of "immediacy" for "contemporaneity" was not intended as a departure from the traditional requirement that such statements be "substantially contemporaneous" with the event perceived. FRE 803 Advisory Committee's Note ("[I]n many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable."). *Cf. Jarvis,* 960 S.W.2d at 469–70 (but finding that the proponent of the evidence had failed to offer any evidence to prove contemporaneity).

 Though Davidson could not know for sure how much time elapsed between the event and when Roberts called her, she believed Roberts called her shortly after the event because there was a telephone extension in the basement and it was Roberts's custom to tell her about any unusual events occurring within the house as soon as they happened.[4] The burden of proof that evidence falls within a hearsay exception is on the party seeking its admission. *Noel,* 76 S.W.3d at 926; *Slaven,* 962 S.W.2d at 854. Davidson's testimony that she believed the statement was made shortly after the incident occurred and why she so believed was sufficient evidence to support the trial court's finding that the statement satisfied the contemporaneity requirement of the hearsay exception for present sense impressions.

#### 2. Corroboration.

 Usually, the testifying witness will have been present when the statement was made and in a position to corroborate the accuracy of the declarant's perception, or at least that the declarant was in a position

---

**4.** Appellant did not object to this evidence of habit and does not cite it as error on appeal. *See Burchett v. Commonwealth,* 98 S.W.3d 492, 499 (Ky.2003) (habit evidence inadmissible in Kentucky).

to make such a perception. Here, of course, that was not the case. Some courts have held that corroboration is an absolute prerequisite to admission of evidence under this exception. *E.g., Myre v. State,* 545 S.W.2d 820, 827 (Tex.Crim.App. 1977) ("[The hearsay] was not admissible as a present sense impression because the witness did not have an equal opportunity to observe and check a possible misstatement . . . ."), *superseded by Tex.R. Evid. 803(1) as stated in Rabbani v. State,* 847 S.W.2d 555, 560 n. 9 (Tex.Crim.App.1992). The better view, however, is that corroboration is not an absolute prerequisite to admissibility, and that its absence affects only the weight of the evidence, so long as the declarant is shown to have personal knowledge of the matters described in the statement. *United States v. Ruiz,* 249 F.3d 643, 647 (7th Cir.2001) (permitting witness to repeat perceptions declarant relayed to him via walkie-talkie: "The lack of another witness who could independently verify [the declarant's] observations . . . bore upon the weight owed to this evidence but did not bar its admission."); *United States v. Mitchell,* 145 F.3d 572, 577 (3d Cir.1998) ("[T]he record here is devoid of circumstances indicating by a preponderance that the author of the anonymous note actually saw Mitchell change cars. Thus, the requirement of personal perception necessary for both the present sense impression and excited utterance exceptions to the hearsay rule is not satisfied."); *Commonwealth v. Coleman,* 458 Pa. 112, 326 A.2d 387, 390 (1974) (permitting homicide victim's mother to repeat statements victim made to her over the telephone describing defendant's conduct relevant to claim of self-defense). *See generally* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.60(3), at 669–70 (4th ed. LexisNexis 2003).

Davidson was the declarant's sister and she knew that Appellant also resided at the declarant's residence. That was suffi-cient circumstantial evidence that the declarant had personal knowledge of Appellant's activities within the residence to admit the statement without corroboration.

### D. Miscellaneous Hearsay.

■ Appellant also complains of Davidson's trial testimony that Roberts told her of problems between Appellant and Roberts. Because of her frail health, the trial court had permitted the Commonwealth to preserve Davidson's testimony by a pretrial deposition. During that deposition, the prosecutor asked Davidson extensively about what Roberts had told her about these problems. Appellant objected on hearsay grounds and the trial court sustained these objections. Consequently, when Davidson testified at trial, the prosecutor asked for a bench conference before examining Davidson on these matters. During this conference, defense counsel told the prosecutor to "just lead her [Davidson] right into that," effectively waiving any objection to the general leading question that elicited from Davidson evidence of the problems between Roberts and Appellant.

■ Finally, Appellant complains of Michelle Roberts's testimony repeating statements made to her over the telephone by an employee of Cincinnati Bell about her mother's long-distance telephone charges. While this testimony was inadmissible hearsay, its admission was harmless error. "The relevant inquiry under the harmless error doctrine 'is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" *Jarvis,* 960 S.W.2d at 471 (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–32, 11 L.Ed.2d 171, 173 (1963)). The Commonwealth had already established these facts through the introduction of telephone

billing records, admitted under the business records exception to the hearsay rule, KRE 803(6). Further, Appellant has never contested the amount of the long-distance telephone charges or that the charges were incurred by him. Thus, Michelle's hearsay testimony was harmless error. *Id.*

## III. CRIME SCENE PHOTOGRAPHS AND VIDEOTAPE.

The Commonwealth introduced four photographs and an edited videotape depicting Roberts's partially-burned body, all taken at the location where the police found it. Appellant objected to these five items on the grounds of relevance and undue prejudice. While photographs of a victim's corpse may often be gruesome, they are also generally admissible if relevant. *Parker v. Commonwealth,* 952 S.W.2d 209, 212–13 (Ky.1997); *Whitaker v. Commonwealth,* 895 S.W.2d 953, 954 (Ky. 1995). *See also Carson v. Commonwealth,* 382 S.W.2d 85, 90 (Ky.1964) ("Even though the admission of a photograph may arouse passion, or bring to mind vividly the details of a shocking crime, if the picture serves to illustrate a material fact or condition, it is considered admissible."). The same rule applies with regard to videotapes of a victim's corpse. *Mills v. Commonwealth,* 996 S.W.2d 473, 489 (Ky.1999). Because the Commonwealth must prove the *corpus delicti,* such photographs are relevant to show the nature of the injuries inflicted by the defendant upon the victim. *Adkins v. Commonwealth,* 96 S.W.3d 779, 794 (Ky.2003).

However, such evidence can be excluded even though relevant if its probative value is substantially outweighed by the danger of undue prejudice. We review a trial court's weighing of these factors for abuse of discretion. *Johnson v. Commonwealth,* 105 S.W.3d 430, 438 (Ky.2003); *City of Louisville v. Yeager,* 489 S.W.2d 819, 821 (Ky.1973). The balance tilts toward inadmissibility of a depiction of the victim's corpse where "the condition of the body has been materially altered by mutilation, autopsy, decomposition, or other extraneous causes, not related to the commission of the crime, so that the pictures tend to arouse passion and appall the viewer." *Clark v. Commonwealth,* 833 S.W.2d 793, 794 (Ky.1991). In this regard, photographs that show substantial animal mutilation have been held inadmissible. *Holland v. Commonwealth,* 703 S.W.2d 876, 879 (Ky.1985).

While the record contains some forty-seven photographs and an unedited videotape that the Commonwealth chose not to introduce at trial, the four photographs and the edited videotape that were introduced are inexplicably absent. Nevertheless, the videotape of Appellant's trial contains a sufficient description of each item's content for us to conclude that the trial court did not abuse its discretion in admitting this evidence.

Appellant did not dispute that he killed Roberts, but he did dispute that he intended to kill her. The four photographs and the videotape each demonstrated to a different extent Appellant's attempts to conceal his crime by placing Roberts's body in a remote location, partially burning it, and covering the remains with plywood and tarpaulins. This evidence of attempted concealment of the crime tended to belie any claim that no crime occurred. *See Adkins,* 96 S.W.3d at 793; *Tamme v. Commonwealth,* 973 S.W.2d 13, 36 (Ky.1998). Appellant was entitled to explain to the jury why he attempted to conceal the body; but such did not preclude the Commonwealth from proving the fact of attempted concealment.

Appellant also claimed that Roberts was already dead when he undertook to conceal her. To dispute this, the Commonwealth introduced a photograph showing that

Roberts's right hand exhibited a bluish coloration. There was expert medical testimony that cyanosis, which has a bluish coloration, can result from cutting off circulation to an extremity. Arrington testified that one of Appellant's versions of the events included tying Roberts up. This photograph was therefore relevant to prove that Appellant restrained Roberts before she died, a fact necessary to prove kidnapping.

A review of the photographs and unedited videotape that were not admitted into evidence demonstrates that the upper left side of Roberts's torso suffered acute animal mutilation. Based on this, Appellant argues that showing the four admitted photographs and the redacted videotape to the jury created a danger of undue prejudice that substantially outweighed the probative value of the evidence. The record shows that three of the admitted photographs excluded views of the mutilated portion of the victim's torso: Commonwealth's Exhibits 102 and 103 were taken while the victim's body remained covered by debris and focused only on the victim's right side; and Exhibit 105 showed only the location between the victim's legs where Appellant set the fire. The fourth photograph, Exhibit 104, included the victim's entire body with the debris removed to show the effects of the burning. Nevertheless, when compared to all of the unadmitted photographs that also revealed the full extent of Appellant's attempt to burn Roberts's body, Exhibit 104 contained the least prejudicial views of the animal perdition, a fact conceded by Appellant's counsel at trial. Likewise, the record reflects that the videotape played at trial omitted the views of Roberts's body from which one could see the animal mutilation in its gruesome detail. The Commonwealth was entitled to introduce evidence cataloging Appellant's attempts to conceal his crimes, even in its grisly detail, *see Barnett v. Commonwealth,* 979 S.W.2d 98, 103 (Ky.

1998), so long as it did not unfairly inflame the jury with views of animal mutilation.

This is not a case like *Funk v. Commonwealth,* 842 S.W.2d 476 (Ky.1992), where "[n]othing was apparent in the pictures which could have possibly assisted the jury in deciding ... disputed testimony," *id.* at 479, or *Holland,* where "the presentation of photographs depicting the animal mutilation of the corpse [went] far beyond demonstrating proof of a contested relevant fact." 703 S.W.2d at 879. The photographs and the videotape were each probative of a relevant issue. The trial court did not abuse its discretion in finding that the probative value of the evidence was not substantially outweighed by the possibility of undue prejudice.

## IV. UNPRESERVED EVIDENTIARY ISSUES.

Under KRE 103(e), we review unpreserved claims of evidentiary error for palpable error. A finding of palpable error must involve prejudice more egregious than that occurring in reversible error, Lawson, *supra,* § 1.10[8][b], at 54 n. 146, and the error must have resulted in "manifest injustice." KRE 103(e); *Brock v. Commonwealth,* 947 S.W.2d 24, 28 (Ky. 1997). Authorities discussing palpable error consider it to be composed of two elements: obviousness and seriousness, the latter of which is present when "a failure to notice and correct such an error would 'seriously affect the fairness, integrity, and public reputation of the judicial proceeding.'" Lawson, *supra,* § 1.10[8][b], at 54 (quoting 1 McLaughlin, *Weinstein's Federal Evidence,* § 103.42[3] (2d ed.2003)). A court reviewing for palpable error must do so in light of the entire record; the inquiry is heavily dependent upon the facts of each case. *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985).

### A. Other Crimes Wrongs or Acts: KRE 404(b).

Appellant claims that the trial court erred in admitting testimony regarding several instances of his conduct that occurred in the time frame immediately preceding and following the kidnapping and murder. Appellant asserts the inadmissibility of this testimony on two grounds: (1) the Commonwealth failed to meet the pretrial notice requirement of KRE 404(c); and (2) the testimony was not relevant to a legitimate purpose under KRE 404(b)(1).

On October 31, 2001, Appellant moved the trial court to compel disclosure of any evidence the Commonwealth intended to introduce pursuant to KRE 404(b). The trial court sustained Appellant's motion, and on December 3, 2001, over eight months prior to trial, the Commonwealth responded by citing its open file policy and additionally listing, *inter alia*, the following:

Potential 404(b) items of evidence which the Commonwealth may seek to introduce in its case in chief depending upon the defense presented include the following:

. . .

d. Defendant's theft of Donald Durban's [sic] food and toiletries;

. . .

l. Defendant's removal and possession of the Crossen's [sic] firearm without their knowledge and replacement of that weapon the morning of his arrest;

Other possible 404(b) evidence that may become necessary for use depending upon the testimony of the Defendant and/or defense witnesses includes the following:

. . .

c. Defendant's history of theft related offenses.

Appellant claims that his October 31, 2001, motion to compel disclosure preserved for appellate review his claim that the evidence was improperly admitted at trial. We disagree. Only "a timely objection or motion to strike," KRE 103(a)(1), a continuing objection permitted by the trial court, *Davis v. Commonwealth,* 147 S.W.3d 709, 721–22 (Ky.2004), or a pretrial motion in limine, KRE 103(d), will preserve an error in the admission of evidence. After the Commonwealth filed its response to the disclosure motion, Appellant never claimed that the disclosure was inadequate or objected to the admissibility of the KRE 404(b) evidence on this notice ground. We thus review Appellant's KRE 404(c) claim only for palpable error.

Appellant claims that the evidence was substantively improper, arguing that none of it was relevant to a legitimate purpose under KRE 404(b)(1), and that its prejudicial effect outweighed its probative value. Appellant claims that it was reversible error for the trial court to admit this evidence and to fail to admonish the jury that this evidence was not to be considered as evidence of propensity. However, Appellant never objected to the admission of any of this testimony at trial, much less requested a limiting admonition. We have held that such admonitions are required only "upon request" and that the failure to request an admonition is generally regarded as trial strategy. *Caudill v. Commonwealth,* 120 S.W.3d 635, 659 (Ky.2003); *Barth v. Commonwealth,* 80 S.W.3d 390, 396–97 (Ky.2001). Certainly, we would not expect a trial judge to *sua sponte* admonish the jury to give a limiting effect to evidence to which there was no objection. The failure to give an unrequested limiting admonition is not palpable error. *United States v. Rhodes,* 62 F.3d 1449, 1453–54 (D.C.Cir.1995), ("[B]ecause Rule 105 commands that an appropriate limiting instruction shall be available 'upon request,' we conclude that we cannot impose upon district courts the obligation to give such

an instruction *sua sponte*."), *vacated on other grounds, Rhodes v. United States,* 517 U.S. 1164, 116 S.Ct. 1562, 134 L.Ed.2d 662 (1996); *United States v. Christian,* 786 F.2d 203, 214 (6th Cir.1986) ("In the absence of a request by defense counsel for a limiting instruction, the failure of the trial court to give one is not reversible error."). Accordingly, we will review the admission of the evidence for palpable error.

### 1. Theft of Money from Purses.

Testimony from Sharon McNay and Betty Davidson, the victim's sisters, established that Roberts kept her own purse and Davidson's purse in the trunk of her car. Both purses were found in a trash receptacle on the first floor of St. Elizabeth Medical Center on April 4, 2000. Denise Arrington testified that Appellant told her that some time after he had killed the victim, he parked the victim's car at St. Elizabeth's and took money from the two purses to pay for a taxi.

■ Although the Commonwealth provided no pretrial notice that specifically mentioned Appellant's theft of money from these purses, the admission of this evidence was not palpable error. As mentioned above, the Commonwealth's response to Appellant's October 31, 2001, motion notified Appellant that his "history of theft related offenses" might be introduced. Moreover, the Commonwealth maintained an open file policy at all times prior to trial. Had Appellant objected to the admission of this evidence, the trial court may have held that these broad references in the KRE 404(c) disclosure statement were insufficient pretrial notice to warrant admission of this evidence. *See, e.g. Daniel v. Commonwealth,* 905 S.W.2d 76, 77 (Ky.1995); *Gray v. Commonwealth,* 843 S.W.2d 895, 897 (Ky.1992). Nevertheless, because Appellant received some notice more than eight months prior to his trial that the Commonwealth might introduce evidence of his thievery, its ad-mission did not constitute manifest injustice.

■ Evidence of this uncharged theft was also admissible for a legitimate purpose. Under KRE 404(b), evidence of other acts may be offered to prove a "plan." In this manner, KRE 404(b) provides an avenue for the admissibility of evidence of uncharged crimes that are "part and parcel of a greater endeavor which included the charged offense." *Commonwealth v. English,* 993 S.W.2d 941, 943–44 (Ky.1999). In this case, the theft could be construed as part of a larger plan to obscure the details surrounding Roberts's disappearance, by parking her car at St. Elizabeth's, discarding the identifying purses in an available trash receptacle, and then using the money taken from the purses to pay for a taxi. Appellant's plan could have been for the police to find Roberts's car and the empty purses at St. Elizabeth's, where she went to visit Davidson virtually every day, and thus conclude that Roberts was robbed and abducted by an unknown assailant while on the hospital grounds. The attempted creation of such a scenario was relevant to Appellant's consciousness of guilt, *Adkins,* 96 S.W.3d at 793, thus refuting his claim that he did not intend to kill Roberts. Since the evidence was offered for a proper purpose, there was no obvious error in admitting it. Lawson, *supra,* § 1.10[8][b], at 54.

Appellant argues that admission of evidence of his other bad acts likely caused the jury to give less credibility to his testimony that he did not intend to kill Roberts and that Roberts was not alive when he moved her. However, Appellant's numerous conflicting statements prior to trial about the events surrounding Roberts's death was more likely to have affected his credibility, as was the medical evidence tending to negate Appellant's claim that Roberts died before the kidnapping. It is

unlikely that evidence of Appellant's theft of a small amount of money (ten dollars) from the purses in Roberts's car substantially affected the jury's assessment of his credibility. Upon a review of the record as a whole, *Young*, 470 U.S. at 16, 105 S.Ct. at 1046–47, we conclude that the admission of this evidence did not constitute palpable error.

### 2. Theft of Money from Cupboard.

Arrington also testified that Appellant admitted taking $150.00 from a cup in Roberts's kitchen cupboard, intending to use that money to pay Roberts for the telephone bill. According to Arrington, Appellant told her that the $150.00 was money he had previously paid to Roberts for rent. Our reasoning with regard to the pretrial notice of Appellant's theft of money from the purses in Roberts's car applies equally here. Thus, for the reasons stated in Part IV(A)(1), *supra*, the admission of this evidence in spite of the Commonwealth's failure to give specific pretrial notice of it was not palpable error.

▮ Like the evidence discussed above, this testimony was also not clearly inadmissible to prove a proper purpose under KRE 404(b). It constituted evidence of an escalation in the ongoing antagonism between Appellant and Roberts over reimbursement of the long-distance telephone charges. The uncharged theft thus related to an ongoing dispute that arguably furnished the motive for the homicide. Thus, we cannot say that the trial court committed obvious error in admitting this evidence or, based on our review of the record as a whole, Part IV(A)(1), *supra*, that the admission of this testimony was manifestly unjust. Thus, its admission was not palpable error.

### 3. Theft of Donald Durbin's Belongings.

▮ Donald Durbin, the other tenant in Roberts's house while Appellant lived there, testified that he began to notice that some of his personal belongings had been moved or were missing after Appellant moved into the house, and that this caused him to put a lock on his door about a week after Appellant moved in. After Appellant had moved out, Durbin discovered that his pool cue, valued at $325.00, was missing. Appellant's argument that there was insufficient KRE 404(c) notice is without merit. Although the Commonwealth's December 3, 2001, disclosure of its KRE 404(b) evidence, reproduced above, identified only "Defendant's theft of Donald Durban's [sic] food and toiletries," that was sufficient to put Appellant on notice of the Commonwealth's intent to introduce evidence of thefts of Durbin's personal property.

▮ However, there was no proper purpose that would authorize its admission under KRE 404(b)(1). The Commonwealth argues that this evidence qualified for admission under KRE 404(b)(2) as inextricably intertwined with the murder and kidnapping. The "inextricably intertwined" rule applies "only to evidence that must come in because it 'is so interwoven with evidence of the crime charged that its introduction is unavoidable.'" *Funk*, 842 S.W.2d at 480 (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.20, at 37 (2d ed. Michie 1984)). *See also Metcalf v. Commonwealth*, 158 S.W.3d 740, 742–43 (2005) (Evidence was not inextricably intertwined where exclusion of testimony about Appellant's abuse of another child "would not have required suppression of any facts and circumstances relevant to the charged sodomy and sexual abuse of [a different minor]."); *Fleming v. Commonwealth*, 284 Ky. 209, 144 S.W.2d 220, 221 (1940) (Evidence is inextricably intertwined where "two or more crimes are so linked together in point of time or circumstances that one cannot be fully

shown without proving the other."). Obviously, the Commonwealth did not need to prove that Durbin's pool cue was missing in order to prove that Appellant kidnapped and murdered Roberts. In fact, since there was no proof that Appellant took the pool cue, the evidence had no probative value at all. *Bell v. Commonwealth,* 875 S.W.2d 882, 890 (Ky.1994); Lawson, *supra* (4th ed.), § 2.25[3][c], at 130–31.

■ Nevertheless, "[e]rror can be found [palpable] only if it is more likely than ordinary error to have affected the judgment." 1 Christopher C. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 21 (2d ed.1994). Because of the substantial evidence the jury could have used to discredit Appellant's account of the night of April 3, 2000, discussed in Part IV(A)(1), *supra,* the improper admission of evidence regarding Durbin's missing pool cue did not result in manifest injustice.

*4. Removal and Possession of the Crossens' Gun.*

■ Mark Crossen, Appellant's coworker at the "Just for Fun" arcade, and Christy Crossen, his wife, testified that they kept a .22–mm Berretta hidden at their home. Appellant lived with the Crossens before moving to Roberts's residence. Mr. Crossen testified that he noticed that his gun was missing approximately two months before Roberts's death. Mrs. Crossen testified that Appellant called her from the Dayton Police Department on April 4, 2000, to tell her that the Berretta was in the safe at the arcade. Mrs. Crossen checked and, indeed, the Berretta was in the safe.

■ Appellant does not claim insufficient pretrial notice of this evidence, but asserts that it was not relevant to any legitimate purpose under KRE 404(b). We conclude otherwise. Arrington testified that Appellant told her in one of his versions of the fatal night's events that Roberts came into Appellant's bedroom, took a gun off the dresser, and tried to hit him with it, thus supporting his claim of self-defense. Evidence of collateral criminal conduct is admissible for the purpose of rebutting a material contention of the defendant. *Moore v. Commonwealth,* 771 S.W.2d 34, 39 (Ky.1988), *abrogated on other grounds by McGuire v. Commonwealth,* 885 S.W.2d 931, 935 (Ky.1994). Evidence that Appellant possessed a gun during the time frame surrounding Roberts's death tended to refute any possible inference that Roberts owned the gun mentioned in that version of the events, an inference that would have tended to support Appellant's claim of self-defense. During its case-in-chief, the Commonwealth could not know which version of the events Appellant would testify to at trial, if he testified at all. It was entitled to introduce evidence to rebut every theory that he had related to Arrington or to the police at the time of his arrest. The testimony regarding Appellant's possession of the Crossens' Berretta was, thus, not obviously inadmissible, and given the substantial other evidence that tended to discredit Appellant's account of the relevant events, Part IV(A)(1), *supra,* admission of this evidence did not result in manifest injustice.

*5. Ice Pick and Stun Gun.*

Detective Carl Agner testified that upon searching Appellant's vehicle, he found and seized an operational stun gun and an ice pick. Appellant asserts that the admission of these items and the testimony regarding his possession of them was improper KRE 404(b) evidence. We fail to see how the stun gun, the ice pick, or this testimony constituted evidence of other crimes, wrongs or acts, much less how its admission resulted in manifest injustice. This evidence was not within the ambit of KRE 404(b), and Appellant's claims on this point are meritless.

## B. Victim Background Evidence.

■ Appellant asserts that the trial court committed reversible error in allowing the Commonwealth to elicit from several witnesses testimony regarding Roberts's family and physical condition. As this claim is unpreserved, our review again is only for palpable error. At trial, the Commonwealth elicited from McNay and Davidson, Roberts's sisters, that Roberts had ten siblings, that Roberts was not working at the time of her death, and that Roberts was drawing disability payments. Toward the end of McNay's testimony, she identified a photograph of Roberts. The Commonwealth left the photograph posted until Davidson also identified it approximately eight and one-half minutes later. Gary Scroggins, Roberts's neighbor, briefly discussed Roberts's physical limitations and the fact that her grandchildren often played with his children. Michelle Roberts and Allison Steele, the victim's daughters, testified that the victim was Davidson's primary caretaker and also discussed the victim's physical limitations.

■ "[A] certain amount of background evidence regarding the victim is relevant to understanding the nature of the crime." *Bussell v. Commonwealth*, 882 S.W.2d 111, 113 (Ky.1994). The prosecution can introduce evidence in the guilt phase identifying a victim as a living person rather than a simple statistic. *McQueen v. Commonwealth*, 669 S.W.2d 519, 523 (Ky.1984). Such evidence does not unduly prejudice a defendant "as long as the victim is not glorified or enlarged." *Bowling v. Commonwealth*, 942 S.W.2d 293, 302–03 (Ky.1997). At the same time, we have held that the introduction of victim impact evidence during the guilt phase is reversible error. *Ice v. Commonwealth*, 667 S.W.2d 671, 676 (Ky.1984). Victim impact evidence differs from victim background evidence, in that the former is "generally intended to arouse sympathy for the families of the victims, which, although relevant to the issue of penalty, is largely irrelevant to the issue of guilt or innocence." *Bennett v. Commonwealth*, 978 S.W.2d 322, 325–26 (Ky.1998).

In the past, we have held it permissible to introduce evidence during the guilt phase that was similar to that introduced in this case, *e.g., Templeman v. Commonwealth*, 785 S.W.2d 259, 261 (Ky.1990) (victim's wife identified a photograph of the victim and testified that during their thirty-five year marriage, they had five children and ten grandchildren); *Nickell v. Commonwealth*, 565 S.W.2d 145, 147 (Ky. 1978) (victim's wife testified as to number and ages of their children). Regarding Roberts's status of receiving disability payments and being the primary caretaker for Davidson, *see Campbell v. Commonwealth*, 788 S.W.2d 260, 263 (Ky.1990) (victim's friend testified that victim was a teacher, was a Beta Club sponsor, and was heavily involved in extracurricular activities); *McQueen*, 669 S.W.2d at 523 (victim's father testified that victim had graduated from college and was working to pay for a masters program). Regarding Roberts's physical condition, *see Wheeler*, 121 S.W.3d at 181 (Commonwealth's witness testified that victim was pregnant); *Campbell*, 788 S.W.2d at 263 (victim's friend testified that victim lifted weights and jogged six miles per day). We note that the testimony regarding Roberts's physical condition was especially relevant, given Appellant's claim before and during trial that Roberts attacked him with a vase. Finally, with one brief exception where Michelle Roberts cried during her account of the day she learned of her mother's disappearance and death, this was not a situation where the witnesses were "overly emotional, condemnatory, accusative, or demanding vindication." *Foley v. Commonwealth*, 953 S.W.2d 924, 937 (Ky.1997). Accordingly,

we conclude that this evidence was permissible victim background evidence.

Each of the cases cited by Appellant involved introduction of victim impact evidence or egregious prosecutorial misuse of victim background evidence during the guilt phase. *Clark v. Commonwealth*, 833 S.W.2d 793, 796–97 (Ky.1992) (prosecutor seized on family's testimony by telling the jury to imagine a hypothetical scenario in which the family was at the scene of the crime, begging "please don't pull that trigger" and offering money to spare the victim's life); *Dean v. Commonwealth*, 777 S.W.2d 900, 904 (Ky.1989) (prosecutor glorified victim during closing argument, misinformed jury that they had an obligation to impose the death penalty, and delivered an improper "Golden Rule" argument), *overruled on other grounds by Caudill*, 120 S.W.3d at 674; *Sanborn v. Commonwealth*, 754 S.W.2d 534, 542–43 (Ky.1988) (cumulative minor errors requiring reversal included prosecutor following up testimony of victim's family members with impassioned closing argument calling attention to the devastating impact on the family); *Ice*, 667 S.W.2d at 675–77 (prosecutor introduced multiple photographs of victim through testimony of victim's mother, interspersed with questions regarding her great love for the victim and her terrible loss). A prosecutor can remind the jury of victim background evidence during closing argument, *Bussell*, 882 S.W.2d at 113, without overly expounding on it. *Campbell*, 788 S.W.2d at 264. There was no prosecutorial misconduct in this case, and the admission of victim background evidence was not palpable error.

### C. Improper Cross–Examination of Appellant.

Appellant contends that the Commonwealth's Attorney cross-examined him in an improper manner, requiring him to characterize the testimony of other witnesses as lies. Again, the issue is unpreserved and is reviewed only for palpable error. We begin by mentioning that several questions of which Appellant complains required him to characterize his own prior statements that were inconsistent with his trial testimony. This is clearly permissible impeachment evidence.

■ On several occasions, the Commonwealth's Attorney brought to Appellant's attention the trial testimony of various Commonwealth's witnesses and asked him whether he would characterize those statements as lies. We have held that this method of cross-examination is improper. *Moss v. Commonwealth*, 949 S.W.2d 579, 583 (Ky.1997) ("A witness should not be required to characterize the testimony of another witness, particularly a well-respected police officer, as lying. Such a characterization places the witness in such an unflattering light as to potentially undermine his entire testimony."). However, after a review of the record as a whole, we are not persuaded that the result would have been different had these questions been withheld. *Compare Caudill*, 120 S.W.3d at 662; *Tamme*, 973 S.W.2d at 28; *Moss*, 949 S.W.2d at 583. While the questions were improper, they did not result in manifest injustice, thus did not amount to palpable error.

### V. GUILT PHASE KIDNAPPING VERDICT.

■ Appellant argues that he was improperly convicted of capital kidnapping, claiming that the jury never found one of the essential elements of capital kidnapping. Again, the issue is not preserved and is reviewed only for palpable error under RCr 10.26. Under this standard, "appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." *Id.* During the

guilt phase of the trial, the judge instructed the jury, *inter alia*, as follows:

You will find the Defendant Shawn William Ernst guilty of Kidnapping under this instruction, if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about the 2nd or 3rd day of April, 2000, and before the finding of the indictment herein, he restrained Sandra Kay Roberts by wrapping her in a tarp, plastic or shower curtain and/or tying her up with rope and locking her in the trunk of a car;

B. That the restraint was without Sandra Kay Roberts' consent;

C. That in so restraining Sandra Kay Roberts it was the Defendant's intention to accomplish or advance the commission of the crime of Tampering With Physical Evidence, or to inflict bodily injury or to terrorize Sandra Kay Roberts or another person;

- *AND* -

D. Sandra Kay Roberts was not released alive.

If you find the Defendant guilty under this Instruction, you shall so state in your verdict *and further state whether you believe from the evidence beyond a reasonable doubt that Sandra Kay Roberts was not released alive.*

(Emphasis added.) The verdict form for kidnapping did not include the additional emphasized language, and the jury did not include it in its verdict. The verdict form, signed by the jury foreperson, read, "We, the jury, find the Defendant Shawn William Ernst GUILTY of Kidnapping under Instruction No. 1." Appellant did not object to the instruction, the verdict form, or the form of the verdict returned by the jury. *Matthews v. Commonwealth,* 709 S.W.2d 414, 420 (Ky.1985).

 ▮ The Sixth Amendment and the Due Process Clause of the United States Constitution entitle every criminal defendant to "a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Apprendi,* 530 U.S. at 477, 120 S.Ct. at 2356; *United States v. Gaudin,* 515 U.S. 506, 509–510, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995). For kidnapping to be enhanced from a Class B felony to a capital offense, the jury must find that the victim was not released alive, or that the victim subsequently died as a result of the kidnapping. KRS 509.040. Appellant asserts that since the jury did not, as instructed, find this enhancing factor in its verdict, it was palpable error to sentence him to capital punishment. We disagree.

"A review of the verdict forms and the potential interpretation the jurors gave them involves consideration of the instructions they were given." *Wilson v. Commonwealth,* 836 S.W.2d 872, 892 (Ky.1992), *overruled on other grounds by St. Clair v. Roark,* 10 S.W.3d 482, 487 (Ky.1999). While the verdict form used here was not ideal, *compare* 1 Cooper, Kentucky Instructions to Juries (Criminal) § 3.79D, at 176 (1999), the form did make reference to Instruction No. 1, which required a finding that the victim "was not released alive." Therefore, the jury necessarily found, beyond a reasonable doubt, that Roberts was not released alive before it convicted Appellant of capital kidnapping. Accordingly, no palpable error occurred.

## VI. PENALTY PHASE INSTRUCTIONS.

 ▮ Appellant argues that the instructions given to the jury during the penalty phase contained an improper aggravating circumstance for the offense of capital kidnapping, *i.e.,* that he "killed Sandra Kay Roberts." Appellant admits that the issue

is unpreserved,[5] but contends that the error was palpable, entitling him to a new sentencing phase trial. The jury was instructed, *inter alia,* as follows:

> In fixing a sentence for the Defendant for the offense of Kidnapping, you shall consider the following aggravating circumstances which you must believe from the evidence beyond a reasonable doubt to be true:
>
> (1) The Defendant killed Sandra Kay Roberts.

The verdict form, signed by the jury foreperson, stated:

> We, the jury, find beyond a reasonable doubt that the following aggravating circumstance or circumstances exist in this case:
>
> (1) The Defendant killed Sandra Kay Roberts.

A sentence of imprisonment for life without benefit of probation or parole cannot be imposed unless the jury has found beyond a reasonable doubt the presence of at least one statutory aggravating circumstance. KRS 532.025(3). In addition to the aggravating circumstances enumerated in KRS 532.025(2)(a), we have held that aggravating circumstances "otherwise authorized by law," KRS 532.025(2), include a kidnapper's *murder* of the victim *during the course of the kidnapping. Salinas v. Commonwealth,* 84 S.W.3d 913, 920 (Ky. 2002); *St. Clair,* 10 S.W.3d at 486–87; *Harris,* 793 S.W.2d at 805.[6]

In the case *sub judice,* the penalty phase instruction erroneously omitted two required elements of the aggravator: (1) that Appellant murdered Roberts; and (2) that the murder occurred during the course of the kidnapping. Use of the word "killed" in place of the word "murdered" was error because it is the requisite mental state for murder that constitutes the aggravating circumstance "otherwise authorized by law." *See St. Clair,* 10 S.W.3d at 486–87 ("The offense of murder contains an element, *i.e.,* either intent to kill . . ., or aggravated wantonness . . ., which is not

5. Appellant made no objection to the instruction until after the trial court had read the instructions to the jury, after closing arguments were completed (during which defense counsel told the jury he expected them to find the aggravating circumstance in view of their finding of guilt of murder), and after the trial judge had directed the jury to begin its deliberations (though they had not yet left the courtroom). RCr 9.54(2) requires that objections to instructions be made before the jury is instructed. *See Hopper v. Commonwealth,* 516 S.W.2d 855, 857 (Ky.1974). The statement in *Harris v. Commonwealth,* 793 S.W.2d 802, 806 (Ky.1990), that "he should have objected on this ground before the jury was sent back to deliberate," was dictum and should not be construed as a *sua sponte* amendment of RCr 9.54(2). *Harris* cited RCr 9.54(2) as authority for that statement, which was technically correct since the defendant had not objected whatsoever to the instruction that he assigned as error on appeal.

Further, Appellant's belated objection was not on the ground that the instruction used the word "killed" instead of "murdered," or that the instruction omitted the requirement that the murder occurred during the course of the kidnapping, but rather on the ground that the murder of a kidnapping victim is not an aggravating circumstance, an argument we previously rejected in *Harris,* 793 S.W.2d at 805. *See Commonwealth v. Duke,* 750 S.W.2d 432, 433 (Ky.1988) (defendant cannot object on one theory at trial and on a different theory on appeal).

6. In his reply brief, Appellant argues that even an instruction requiring the jury to find that he murdered Roberts during the course of the kidnapping would be inadequate under KRS 532.025. He claims that the language of KRS 532.025(3) mandates use of one of the aggravating circumstances enumerated in KRS 532.025(2)(a) and no others. We rejected this same argument in *Harris,* when we construed the introductory language of KRS 532.025(2) to authorize "the judge and jury to consider 'any aggravating circumstances otherwise authorized by law.' " *Harris,* 793 S.W.2d at 805. We decline Appellant's invitation to overrule *Harris.*

required to enhance kidnapping from a class A[sic] felony to a capital offense."). No manifest injustice occurred, however, because the jury had already found during the guilt phase that Appellant murdered Roberts.

The omission of the requirement that the jury find that the murder occurred "during the course of the kidnapping" was not palpable error because when the jury convicted Appellant of kidnapping in the guilt phase, it necessarily found beyond a reasonable doubt that Roberts was alive when Appellant restrained her. The offense of kidnapping requires that the defendant restrain "another person." KRS 509.040(1). Manifestly, one cannot kidnap a dead body. However, the fact that a defendant mistakenly believes the victim is dead is no defense. *United States v. Davis*, 19 F.3d 166, 169 (5th Cir.1994). Appellant's primary defense to the kidnapping charge in the guilt phase was that Roberts was already dead when he began his efforts to conceal her body. It is elementary that the offense of murder is not completed until the victim has died. *Cf. Warmke v. Commonwealth*, 297 Ky. 649, 180 S.W.2d 872, 873 (1944) ("Proof of the corpus delicti in homicide cases involves two principal facts, namely, that the person is dead and that he died as a result of the injury alleged to have been received."). Hence, the jury had necessarily concluded beyond a reasonable doubt that the murder was not completed when the kidnapping occurred, *i.e.*, that Roberts did not die until some point during the course of the kidnapping. The omission from the penalty phase instruction of language requiring it to repeat this finding did not result in manifest injustice.[7]

█ Finally, Appellant complains that the Commonwealth did not provide him with pretrial notice of what evidence it intended to rely upon in aggravation as required by KRS 532.025(1)(a). Again, this issue was not raised at trial and is reviewed only for palpable error. Appellant was initially indicted only for murder. After receiving the autopsy results containing evidence that Roberts died sometime after Appellant placed her in the trunk of his car, the Commonwealth sought and obtained an additional indictment for kidnapping. The indictments were jointly tried without objection. On July 19, 2002, the Commonwealth served notice of its "intent to proceed in the trial of this matter with both counts of the indictments set forth above as a capital case with aggravating circumstances." The only aggravating circumstance proven by the Commonwealth was the murder of the victim. The initial indictment put Appellant on notice of the Commonwealth's intent to prove that he murdered Roberts. *Harris*, 793 S.W.2d at 804. Thus, no palpable error occurred as a result of the Commonwealth's failure to specify in its July 19, 2002, notice that it was relying on the murder of the victim as the aggravating circumstance authorizing capital punishment for the kidnapping.

Accordingly, the judgment of convictions and sentences imposed by the Boone Circuit Court are affirmed.

All concur.

---

7. Our decision to reverse after a similar instruction was given by the trial court in *Salinas* is distinguishable. In *Salinas,* we reached that decision only after reversing the defendant's convictions for murder and kidnapping because of the admission of inadmis-

sible hearsay evidence. *Salinas,* 84 S.W.3d at 918–19. In the case *sub judice,* the convictions remain intact and are reliable proof of the jury's guilt-phase findings that Appellant murdered Roberts during the course of kidnapping her.