**Kevin McELROY, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2011–CA–000235–MR.

Court of Appeals of Kentucky.

Dec. 21, 2012.

Shannon Dupree, Assistant Public Advocate, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Jeffrey A. Cross, Assistant Attorney General, Frankfort, KY, for appellee.

Before CAPERTON, LAMBERT, and VANMETER, Judges.

*OPINION*

LAMBERT, Judge:

Kevin Todd McElroy has directly appealed from the final judgment and sentence of imprisonment entered by the Madison Circuit Court convicting him of first-degree robbery and sentencing him to fifteen years' imprisonment. On appeal, McElroy requests a reversal of his conviction due to alleged evidentiary errors and due to the improper imposition of court costs against him. We have thoroughly reviewed the record and find no error or abuse of discretion related to his conviction and sentence, but we agree that the imposition of costs was improper. Therefore, we affirm in part, vacate in part, and remand.

In May 2010, the Madison County grand jury indicted McElroy on one count of first-degree robbery pursuant to Kentucky Revised Statutes (KRS) 515.020. This charge arose from an incident on July 7, 2009, when McElroy was identified as the person who entered the Park–It Market in Richmond, Kentucky, and demanded the register money from Charles Sullivan, the store's owner. McElroy was armed with a pistol at the time. McElroy was not arrested for this crime until March 8, 2010.

The matter proceeded to a two-day trial beginning on September 27, 2010. The first witness to testify was Charles Sullivan, who has owned and run the Park–It Market for ten years. The store is equipped with a video surveillance system. On the evening of July 7, 2009, Mr. Sullivan testified that he was robbed by McElroy. Mr. Sullivan was originally in the office checking his e-mail when he saw McElroy crouched down in one of the aisles on the video monitor. He came out of the office and greeted McElroy. Mr. Sullivan recognized McElroy's voice, stating that he had become familiar with his voice over the last several months through short conversations with him when he purchased cigarettes once or twice per day. On the night of the robbery, Mr. Sullivan reported that McElroy was wearing jeans, a white t-shirt, sunglasses, and a black toboggan. He spoke with McElroy for approximately two minutes, and McElroy specifically asked for a pack of Marlboro cigarettes while walking to the door. Mr. Sullivan then went behind the counter and when he turned around with the pack of cigarettes, McElroy, who was the width of the counter away from Mr. Sullivan, had a gun in his right hand pointed at Mr. Sullivan's middle section and told Mr. Sullivan to give him the money. Mr. Sullivan responded by saying, "You've got to be kidding." McElroy then repeated to him, "I said give me the money." Mr. Sullivan then asked him, "Why would you do this?" McElroy responded by again telling him to give him the money, leaned over the counter, and placed the gun at Mr. Sullivan's

temple. Concerned that McElroy knew he could identify him, Mr. Sullivan thought McElroy was going to shoot him, so he gave him the cash from the register. McElroy then ran out of the door and turned to his right toward the trailer park. Mr. Sullivan immediately called the police. Mr. Sullivan further testified that he identified McElroy through his body movements, mannerisms, the way he was walking, and his voice inflections. On the stand, Mr. Sullivan identified the black toboggan and sunglasses introduced into evidence by the Commonwealth as the ones McElroy could have been wearing that night.

On cross-examination, Mr. Sullivan stated that he told the police that McElroy had held the gun to his head, although it was not in the written report. And while he also thought he had testified to that before the grand jury, a portion of Mr. Sullivan's grand jury testimony was played for the jury in which he explained how he recognized McElroy when he came into the store the night of the robbery and described the events of that night, but not that McElroy had held a gun to his head. On redirect examination, Mr. Sullivan confirmed that he was never asked to detail how McElroy was holding the gun or where he was pointing it, or exactly what he said that night.

The next witness to testify was Rodney Richardson, a detective/sergeant with the Richmond Police Department. Detective Richardson investigated the robbery at Park–It Market and arrived at the market at approximately 9:30 p.m. that evening. The police department had received a call at 8:44 p.m. reporting the robbery. Detective Richardson spoke to the responding officer, who provided him with details of the robbery. Detective Richardson also spoke with several witnesses and later obtained telephone records of Kelsey Baker and McElroy. Detective Richardson conducted a search of McElroy's residence the day after the robbery, and he took two items from McElroy's bedroom nightstands—a black toboggan and black plastic sunglasses—which were admitted into evidence. At the Park–It Market, Detective Richardson copied the security video and created several still photographs from the video. He noticed in the video that the robber kept rubbing his right arm. He interviewed McElroy in the afternoon following the search of his residence. During the interview, McElroy kept his arms crossed, with his left hand on his right arm, which he sometimes scratched. He later stated that he had poison ivy and was trying to keep it from itching.

The Commonwealth then played the video recording of Detective Richardson's interview of McElroy for the jury without objection.. At the beginning of the interview, Detective Richardson asked him about his past record, and McElroy stated that he had two DUIs and a conviction for possession of Percocet. Detective Richardson then questioned McElroy extensively about what he had been doing on the day of the robbery. McElroy explained that he spent the day with his friend, Joshua Boblitt,[1] took a car trip to Berea with Mr. Boblitt and Marlon and Deana Madison, and made a visit to his girlfriend, Kelsey Baker's house. After a period of time, Detective Richardson asked McElroy about his arm, and McElroy stated that he had gotten poison ivy from his back yard. Throughout the interview, McElroy never deviated from his claim that he did not commit the robbery. The Commonwealth then played the security video that was taken the night of the robbery. The video revealed a man scratch-

1. McElroy referred to Mr. Boblitt by his nickname of "Chester" during his testimony.

ing his right arm and then placing his hand on that arm. After the video was completed, Detective Richardson testified that between $400.00 and $500.00 was taken from the register.

On cross-examination, Detective Richardson stated that he did not arrest McElroy the day of the interview because he was waiting for telephone records and wanted to talk in person with Ms. Baker. McElroy was arrested five months later when he was in court on an unrelated matter. Detective Richardson never found the gun used in the robbery, nor did he see one in the security video because the camera showing the counter was not working that night. He also identified the witnesses he spoke to as Gary and Kathy Heisel, who watched the robber run through the field from their porch. Mr. Heisel did not identify McElroy as the person he saw from the photo line-up.

Next, the Commonwealth called Marlon Madison to testify. Mr. Madison testified that on the day of the robbery, he and his wife drove Mr. Boblitt and McElroy to Wal–Mart in Berea. They picked the two men up between 4:30 p.m. and 5:00 p.m. While he had seen McElroy before, they were not acquaintances. He described McElroy as wearing a plain white t-shirt and blue jeans. On cross-examination, Mr. Madison stated that McElroy was not wearing sunglasses or a hat. On redirect, Mr. Madison stated that after the trip to Berea he dropped McElroy and Mr. Boblitt off at Mr. Boblitt's apartment, which was a street over from the Park–It Market.

Deana Madison, Mr. Madison's wife, testified next. She recalled making a trip to Berea with Mr. Boblitt, McElroy, and her husband the prior July. She only met McElroy that day, and had not seen or talked to him since then. She reported that McElroy was wearing a light colored button-up shirt with a white shirt underneath.

Joshua Boblitt was the next witness to testify. Mr. Boblitt met McElroy through a mutual friend in 2007 or 2009. He was a friend of McElroy and McElroy's brother, and they would watch movies and play video games. Detective Richardson had Mr. Boblitt come in for a statement after the robbery. He stated that the day of the robbery, McElroy came to his house at about 3:30 p.m. and they watched television for awhile until the Madisons picked them up to go to Berea. They returned at about 6:00 p.m., and he and McElroy watched television until about 8:00 p.m. when "Two and a Half Men" ended. McElroy said he was going to Ms. Baker's house next. Mr. Boblitt saw McElroy again between 9:30 p.m. and 10:00 p.m. when McElroy came back to his apartment. Mr. Boblitt did not remember if McElroy spent the night, noting that he was not there in the morning, but he did see McElroy at noon the next day.

Brandon Wren testified next. Mr. Wren had known McElroy for two years, but had never met Mr. Boblitt. In September of the previous year, Mr. Wren testified that he picked McElroy up to ride around, and McElroy told him about the robbery and that he had done it. McElroy told him that Chester[2] had dropped him off in the neighborhood behind Park–It Market and he walked to the store. McElroy had his toboggan and sunglasses on, put the pistol to the clerk's face, and took the money. McElroy stated that he was mad because he did not get as much as he wanted; he

---

**2.** Mr. Wren identified Mr. Boblitt as "Chester," a nickname McElroy used for Mr. Boblitt.

said he got between $300.00 and $400.00. McElroy ran back to his car, and he was out of breath and nervous by the time he got to the car. He told Mr. Wren the gun belonged to Chester. Mr. Wren talked with McElroy about it on later occasions, when McElroy stated he got a lot of street credibility for committing the robbery and that people were scared of him. Mr. Wren admitted that he was a convicted felon. On cross-examination, Mr. Wren admitted that when he was arrested in October 2009, he offered to make a statement regarding McElroy. McElroy was with him when he was arrested.

In a bench conference, the Commonwealth sought permission to elicit testimony related to the motive for committing the crime, which the Commonwealth claimed was to purchase drugs from a person in Lexington and from Ms. Baker. McElroy objected to the admission of this testimony, as it had to do with other bad acts, and the court sustained the objection. The court permitted the Commonwealth to introduce the testimony by avowal. After dismissing the jury for the day, the Commonwealth took the remainder of the testimony by avowal. Mr. Wren testified that Mr. McElroy told him he needed the money from the robbery to buy pills with Chester. They purchased some pills from Ms. Baker and were planning to buy pills from a man in Lexington.

The Commonwealth closed its case, and McElroy moved for a directed verdict. The court denied the motion.

McElroy's sole witness was Kelsey Baker. Ms. Baker testified that on the day of the robbery, she was at her mother's house. McElroy came to see her there, but she did not remember what time he arrived. After reviewing her statement, she remembered that it was at night that she saw him. She also did not remember what he was wearing. When McElroy ar-rived, they started watching a movie. Ms. Baker did remember speaking to Detective Richardson the day after the robbery. On cross-examination, she recalled stating that McElroy arrived shortly after she received a text message from him, and that he arrived between 6:30 p.m. and 6:40 p.m. She also recalled telling Detective Richardson that she had only recorded 70 minutes of the movie they watched that evening. McElroy was there for another ten minutes after the movie ended. Ms. Baker said she saw McElroy a couple of times a week, and that they met when she was working at Frisch's. She stated that she was not his girlfriend; she lived with her fiancé, James, in Berea. She stated that she is now married, but lives in Louisville in a halfway house due to her addiction to drugs. Ms. Baker said she did not give any pills to McElroy. She admitted that James had sold pills in the past and that she became addicted to the pills.

McElroy renewed his motion for a directed verdict after the close of his case, noting that the Commonwealth had not produced any evidence, other than Mr. Sullivan's testimony, about the existence of a gun. The court denied the motion.

At the conclusion of the trial, the jury returned a guilty verdict on the first-degree robbery charge pursuant to Instruction 6, and following the penalty phase, recommended a sentence of fifteen years. The trial court held a sentencing hearing, after which the final judgment and sentence of conviction was entered on December 7, 2010. Pursuant to the jury's recommendation, McElroy received a fifteen-year sentence. The trial court also credited McElroy with 270 days towards service of his sentence, ordered him to attend a substance abuse program while incarcerated, and ordered him to pay $155.00 in

court costs within six months of his release. This appeal follows.[3]

On appeal, McElroy contends that the improper cross-examination of defense witness Kelsey Baker deprived him of due process, that his due process rights were violated by the introduction of evidence of prior crimes and bad acts, and that he was improperly ordered to pay court costs due to his status as a pauper. None of these issues was properly preserved for appeal before the trial court, and McElroy requests that we review these issues for palpable error pursuant to Kentucky Rules of Criminal Procedure (RCr) 10.26. In its responsive brief, the Commonwealth urges this Court to affirm the judgment.

■ McElroy's first argument addresses the Commonwealth's cross-examination of defense witness, Kelsey Baker. He claims that his due process rights were violated when the Commonwealth questioned Ms. Baker about whether he had purchased drugs from her and later argued that his drug purchases were the motive for the robbery. McElroy contends that this testimony should have been excluded because it was evidence of character pursuant to Kentucky Rules of Evidence (KRE) 608.[4]

RCr 10.26 defines a palpable error as an "error which affects the substantial rights of a party [that] may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted

upon a determination that manifest injustice has resulted from the error."

In *Martin v. Commonwealth*, 207 S.W.3d 1 (Ky.2006), the Supreme Court of Kentucky set forth the most recent expression of the palpable error standard of review:

This Court reviews unpreserved claims of error on direct appeal only for palpable error. To prevail, one must show that the error resulted in "manifest injustice." . . .

. . . .

This Court has stated:

Under [RCr 10.26], an error is reversible only if a manifest injustice has resulted from the error. That means that if, upon consideration of the whole case, a substantial possibility does not exist that the result would have been different, the error will be deemed nonprejudicial.

[*Graves v. Commonwealth*, 17 S.W.3d 858, 864 (Ky.2000) (quoting *Jackson v. Commonwealth*, 717 S.W.2d 511, 513 (Ky.App.1986)).] While this statement is not inaccurate, it fails to adequately describe the necessary degree of prejudice associated with the unpreserved question in the context of the whole case. The language "[a] substantial possibility does not exist that the result would have been different" is at best confusing, and it falls short of the required standard. A better understanding is gained from an examination of

---

3. This Court granted McElroy's motion for a belated appeal on April 21, 2011.

4. The Commonwealth argues that McElroy is precluded from making this argument because he did not argue that the trial judge committed palpable error, but rather the prosecutor did so. In support of this argument, the Commonwealth relies on *Carrs Fork Corp. v. Kodak Min. Co.*, 809 S.W.2d 699, 701

(Ky.1991) ("In applying [CR 61.02], the palpable error must result from action taken by the court rather than an act or omission by the attorneys or litigants."). We agree with McElroy that *Carrs Fork* is inapplicable to the present case because it is a civil case and addresses the application of CR 61.02, not RCr 10.26, which applies in the current action.

RCr 10.26 with emphasis on the concept of "manifest injustice." While the language used is clear enough, we further explain that the required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law.

In *United States v. Cotton,* [535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002),] the Supreme Court analyzed the plain error test of Federal Rule of Criminal Procedure 52(b), the federal counterpart of RCr 10.26. At issue was an indictment that failed to meet the requirements of *Apprendi v. New Jersey,* [530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] but where the respondents had failed to raise the *Apprendi* claim before the trial court. Despite failure of preservation, the United States Court of Appeals for the Fourth Circuit vacated the sentences on grounds that failure of the indictment to set forth all necessary elements of the offense violated both mandatory and jurisdictional requirements. Rejecting the holding with respect to jurisdiction, the Supreme Court proceeded to the plain error test of Federal Rule of Criminal Procedure 52(b). The Court reviewed the plain error components from its precedents, but focused primarily on an element from *Johnson v. United States* [520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997),] as follows: "an appellate court may then exercise its discretion to notice a forfeited error but only if . . . the error seriously affects the fairness, integrity or public reputation of judicial proceedings." [*Cotton,* at 631, 122 S.Ct. 1781; *see also Ernst v. Comm.,* 160 S.W.3d 744, 758 (Ky.2005)(properly applying this standard to an evidentiary error under KRE 103(e)). Reversing the Fourth Circuit, the Supreme Court remanded for reinstatement of the sentences on grounds that the unpreserved *Apprendi* error did not meet the requirements for plain error.]

While the language of RCr 10.26 and Federal Rule of Criminal Procedure 52(b) differ substantially, and recognizing that this Court is not obligated to follow *Cotton,* we nevertheless believe it to be a valuable guide in the application of our palpable error rule. To discover manifest injustice, a reviewing court must plumb the depths of the proceeding, as was done in *Cotton,* to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable.

*Martin,* 207 S.W.3d at 3–4. *See also Commonwealth v. Jones,* 283 S.W.3d 665, 668 (Ky.2009) (holding that palpable error relief is not available unless three conditions are present: 1) the error was clear or plain under existing law; 2) it was more likely than ordinary error to have affected the judgment; and 3) it so seriously affected the fairness, integrity, or public reputation of the proceeding to have been jurisprudentially intolerable). With this standard in mind, we shall address McElroy's unpreserved arguments.

McElroy contends that the Commonwealth improperly introduced evidence of Ms. Baker's character through cross-examination. Specifically, he argues that the Commonwealth erred in cross-examining Ms. Baker about her drug use, her husband's drug use, and whether she sold drugs to McElroy, and further erred in boot-strapping this testimony to support its theory regarding McElroy's motive for committing the robbery; *i.e.,* to buy drugs. McElroy claims that this evidence of her and her husband's drug use was irrelevant to the case against him, and that the court had previously disallowed testimony through Mr. Wren regarding his drug use as a motive for the robbery.

KRE 404 provides that character evidence is generally inadmissible, with a few

exceptions, such as evidence of the character of a witness:

   (a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

   . . . .

   (3) Character of witnesses. Evidence of the character of witnesses, as provided in KRE 607, KRE 608, and KRE 609.

As McElroy states in his brief, at issue in this case is the application of KRE 608, which addresses evidence of character and conduct of a witness:

   (a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

   (b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness: (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. No specific instance of conduct of a witness may be the subject of inquiry under this provision unless the cross-examiner has a factual basis for the subject matter of his inquiry.

The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the accused's or the witness' privilege against self-incrimination when examined with respect to matters which relate only to credibility.

McElroy contends that because the Commonwealth was unable to tie Ms. Baker's drug use to her ability to recall the events of July 7, 2009, or to her testimony at trial, it made that evidence irrelevant. He also contends that the motive argued by the Commonwealth in its closing argument—the robbery was intended to obtain money to purchase drugs—did not match the motive elicited from another of the Commonwealth's witnesses—to obtain street credibility. Furthermore, McElroy contends that the information Ms. Baker provided was prejudicial to him because evidence of his guilt was not overwhelming. While we do agree that perhaps the Commonwealth improperly elicited this testimony concerning McElroy's drug use through Ms. Baker's testimony, we do not agree that this error reaches the level of palpable error. Rather, our review of the case as a whole convinces this Court that McElroy's right to due process was not threatened and that there was not a defect in the proceeding so shocking or jurisprudentially intolerable to reach the level of manifest injustice. *See Martin, supra.*

The testimony of the victim, Mr. Sullivan, was more than sufficient to establish guilt on McElroy's part. Mr. Sullivan testified that he was familiar with McElroy from his daily visits to the Park–It Market during the past months to purchase cigarettes and that he recognized his voice and

body movements immediately. Accordingly, we hold that the introduction of evidence concerning McElroy's drug use as a motive for committing the robbery via Ms. Baker's testimony is nonprejudicial to the case as a whole, and therefore McElroy has failed to establish the level of palpable error and manifest injustice sufficient to justify further review or a reversal of his conviction.

■ For his second argument, McElroy contends that his due process rights were denied by the introduction of other crimes or bad character evidence through the replay of his statement to Detective Richardson when he stated that he had two prior DUIs and a conviction for possession of Percocet. This issue is also unpreserved.[5]

In support of his argument, McElroy relies upon KRE 404(b):

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

McElroy contends that his references to DUIs and the possession conviction were irrelevant to any contested issue in this case and were therefore inadmissible, citing case law interpreting KRE 404(b) stating that a defendant is entitled to a fair trial only for the particular crimes with which he was charged. The Commonwealth, on the other hand, points out that McElroy fails to cite to any authority suggesting that the trial judge must interrupt the Commonwealth's proof to determine whether the defense does not object to the jury hearing what is being presented.

Based upon our review of the evidence presented, we must hold that even if the admission of the portion of the videotaped statement related to past crimes constituted error, it certainly did not rise to the level of palpable error or manifest injustice to justify our further review. While McElroy is correct that KRE 404(b) generally excludes evidence of other crimes with limited exceptions, the situation of this case makes the rule's application less clear. The evidence at issue came in through the playing of McElroy's recorded statement with police the day after the robbery and was apparently meant to aid in the identification of McElroy as the robber because of his reaction to a poison ivy infection. Obviously, McElroy was present during the recorded interview, and he and presumably his counsel would both have been aware of what he said during that time. In addition, even without this portion of the statement, there was sufficient evidence to permit the jury to convict McElroy of the robbery charge, based on Mr. Sullivan's testimony and the evidence recovered from McElroy's bedroom. Therefore, we hold that the introduction of evidence of McElroy's past bad acts through his recorded interview with the police, if indeed it was error, did not reach the level of palpable error.

■ Finally, McElroy contends that, as an indigent person, he should not have

---

**5.** The Commonwealth again argues that McElroy is precluded from making this argument because his argument is not based upon the allegation of palpable error by the trial court, citing *Carrs Fork, supra.* We reject this argument for the reason set forth in footnote 4.

been ordered to pay court costs of $155.00 within six months of his release from custody. KRS 23A.205 provides for the payment of court costs in criminal cases and states as follows:

(1) Court costs for a criminal case in the Circuit Court shall be one hundred dollars ($100).

(2) The taxation of court costs against a defendant, upon conviction in a case, shall be mandatory and shall not be subject to probation, suspension, proration, deduction, or other form of non-imposition in the terms of a plea bargain or otherwise, *unless the court finds that the defendant is a poor person as defined by KRS 453.190(2) and that he or she is unable to pay court costs and will be unable to pay the court costs in the foreseeable future.*

(3) If the court finds that the defendant does not meet the standard articulated in subsection (2) of this section and that the defendant is nonetheless unable to pay the full amount of the court costs and fees at the time of sentencing, then the court shall establish a show cause date by which time the court costs, fees, and fines shall be paid and may establish an installment payment plan whereby the defendant pays the full amount of the court costs, fees, and fines to the circuit clerk in installments as established by the court. All court costs and fees under the installment plan shall be paid within one (1) year of the date of sentencing notwithstanding any remaining restitution or other monetary penalty owed by the defendant and arising out of the conviction. Installment payments will be applied first to court costs, then to restitution, then to fees, and then to fines.

KRS 23A.205 (emphasis added).

McElroy relies upon the Supreme Court's recent opinion of *Travis v. Commonwealth,* 327 S.W.3d 456 (Ky.2010), for both the merits of his argument and for its holdings concerning the unpreserved nature of the issue:

The Appellants' first assignment of error is the trial court's imposition of court costs and fines. According to the Appellants, these fines were improper because the trial court had already recognized their indigent status pursuant to KRS Chapter 31.

Subsection (4) of KRS 534.040 provides that "[f]ines required by this section shall not be imposed upon any person determined by the court to be indigent pursuant to KRS Chapter 31." Nor may court costs be levied upon defendants found to be indigent. KRS 23A.205(2). At the time of trial, both Travis and Dawson were receiving the services of a public defender, and were granted the right to appeal in *forma pauperis.* They were clearly indigent. Thus, the trial court clearly erred in imposing a fine and court costs upon the Appellants. *See Simpson v. Commonwealth,* 889 S.W.2d 781, 784 (Ky. 1994).

Travis and Dawson concede that this error is not preserved for appellate review. "Nonetheless, since sentencing is jurisdictional it cannot be waived by failure to object." *Wellman v. Commonwealth,* 694 S.W.2d 696, 698 (Ky.1985). "Thus, sentencing issues may be raised for the first time on appeal and Appellant is proceeding properly before this Court." *Cummings v. Commonwealth,* 226 S.W.3d 62, 66 (Ky.2007). Fines and costs, being part of the punishment imposed by the court, are part of the sentence imposed in a criminal case. Having the inherent jurisdiction to cure such sentencing errors, this Court vacates the fines and court costs.

*Travis,* 327 S.W.3d at 459.

The Commonwealth, in turn, cites to the Supreme Court's more recently rendered

opinion of *Maynes v. Commonwealth*, 361 S.W.3d 922 (Ky.2012), which was rendered after the judgment on review was entered:

Having carefully considered the applicable statutes, we conclude that the trial court was authorized under Kentucky law to impose court costs despite Maynes's status as an indigent defendant entitled to the services of a public defender. While the directive in KRS 31.110(1) that the court "shall waive all costs" for such defendants seems mandatory at first blush, a full reading of the 1972 legislation and the current DPA Act belies that conclusion. From its inception through the present, the DPA Act has allowed for imposition of costs against those DPA-represented defendants who can afford to pay. Moreover, a person may qualify as "needy" under KRS 31.110 because he cannot afford the services of an attorney yet not be "poor" under KRS 23A.205 as it has existed since 2002 unless he is also unable to pay court costs without "depriving himself or his dependents of the necessities of life, including food, shelter or clothing." Finally, the KRS 23A.205 directive to consider not only the defendant's present ability to pay court costs but also his ability "in the foreseeable future" cannot be overlooked. The trial court's determination here that Maynes would be able to earn enough within the six months following his sentencing to afford the costs required by KRS 23A.205 is not clearly erroneous and, thus, the Court of Appeals correctly upheld the portion of Maynes's sentence imposing those costs.

*Maynes*, 361 S.W.3d at 929.

While the trial court provided McElroy with a six-month period of time to pay the court costs once he was released from incarceration, there is no indication in the record that the court made any findings on this issue, in contravention of KRS 23A.205(2). Therefore, there is nothing for this Court to review. Accordingly, we must vacate the portion of the judgment imposing costs and remand this matter in light of the holding in *Maynes* for appropriate findings as set forth in KRS 23A.205(2).

For the foregoing reasons, the portion of the judgment convicting and sentencing McElroy is affirmed, the portion of the judgment imposing court costs is vacated, and this matter is remanded to the Madison Circuit Court for further proceedings in accordance with this opinion.

ALL CONCUR.