# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: FEBRUARY 19, 2026
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2025-SC-0027-MR

WAYNE M. HAGGARD                                                       APPELLANT

V.
ON APPEAL FROM BOONE CIRCUIT COURT
HONORABLE RICHARD A. BRUEGGEMANN, JUDGE
NO. 23-CR-00403

COMMONWEALTH OF KENTUCKY                                              APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Following a four-day trial, a Boone Circuit Court jury convicted Appellant, Wayne Haggard ("Haggard"), of Murder. He was sentenced in accordance with the jury's recommendation to twenty-eight (28) years of incarceration. Haggard now appeals as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record, the arguments of the parties, and the applicable law, we affirm the Boone Circuit Court.

## BACKGROUND

On April 22, 2023, Haggard was spending time with his family at his mother's home in Florence, Kentucky, when he, his brother, Jacob Haggard ("Jacob"), his brother, Troy Haggard ("Troy"), and a neighbor, Deanna Shamblin ("Shamblin"), noticed a car they did not recognize parked facing the wrong direction on the street across from Haggard's mother's home. The vehicle sat

idle for approximately two to three hours, leaving the area at one point but then returning.

Around 9:00 p.m., Jacob and Haggard approached the vehicle because the car looked "out of place," and told the driver, who was later identified as Dan Lakiko ("Lakiko"), that he needed to leave, and that "this ain't your neighborhood." At trial, Haggard cited concerns that Lakiko was canvasing the neighborhood for potential burglaries, provoking his initial interaction with Lakiko. While what exactly took place during the exchange was disputed at trial, all parties agree that some sort of confrontation took place which resulted in Lakiko, Haggard, and Jacob engaging in a physical altercation resulting in minor injuries to all three. Following this altercation, Lakiko returned to his vehicle, where Haggard shot him five times, including at least one time through the car door. When police arrived, Haggard proclaimed that he had "overreacted." Over the course of the evening, Haggard had consumed approximately six to ten beers. Drug testing of his body revealed that Lakiko was under the influence of marijuana when he passed away. Lakiko lived four houses down from the scene of the shooting.

At trial, Haggard claimed he acted in self-defense and defense of others. He testified that when he and Jacob approached the vehicle to ask Lakiko what he was doing there, Lakiko unpredictably and inexplicably lunged out of his vehicle and wrestled around with Jacob. Haggard had a beer in his hand, indicating that he had not intended to engage in any scuffle or need to use his hands for any reason. Nevertheless, Haggard and Troy intervened, with the

2

three brothers and Shamblin encouraging Lakiko to get in his car and leave, and Lakiko repeatedly making threats to the effect of, "when I get in my car, I'm gonna kill one of you m*****f*****s" and "I'll shoot every one of you m*****f******s." Lakiko returned to his vehicle, where, with his right foot in the vehicle and his left foot out of the vehicle, he began rummaging around and reaching towards his floorboards. Haggard then observed Lakiko bend over under the steering wheel and then appear to pull up, perhaps with something in his right hand. Haggard testified that he feared Lakiko was pulling out a gun and was going to fire upon him, Jacob, Shamblin, or his children, whom he could hear talking somewhere in the distance. This is when Haggard unholstered his own weapon and shot Lakiko. At trial, Troy, Haggard, and Shamblin each testified that they believed that Lakiko had a gun when he was reaching up from the vehicle. No gun was found in or around Lakiko's vehicle. The only gun found at the scene was the one used by Haggard to kill Lakiko.

The Commonwealth had a different theory of the case. They suggested that Lakiko was dragged out of the car by the intoxicated Haggard brothers, who felt that Lakiko looked like he did not belong there. The Commonwealth suggested that Haggard's statements that Lakiko lunged out of the car unprovoked were unlikely given that Haggard and Jacob were under the influence of alcohol, a substance with a greater reputation for making people aggressive than marijuana. Either way, the Commonwealth found it unlikely that, had Lakiko been threatening to kill the Haggards, the Haggards would have encouraged Lakiko to return to his vehicle, where he may have had access

3

to weapons. The Haggard brothers were each significantly larger in size than Lakiko, implying that even if Lakiko had been the initial aggressor in the physical altercation, the Haggard brothers could have easily managed the threat without resort to deadly force. Instead of retrieving a weapon from his car, it is possible that Lakiko was actually hiding behind his car door for safety from the Haggards. The Commonwealth pointed out that Haggard had completed a carrying concealed deadly weapons course in which he learned that a defense to a charge of murder is to claim self-defense and suggested that all witnesses who testified in alignment with Haggard's theory were also socially aligned with Haggard and had a motive to fabricate testimony to keep Haggard from going to prison.

Prior to trial, Haggard filed a motion to dismiss, arguing that he was acting in self-defense by shooting Lakiko. In denying Haggard's motion, the trial court found that the Commonwealth had sufficient evidence to support probable cause that Haggard was not engaged in self-defense. At trial, defense counsel moved for a directed verdict, reasserting Haggard's claim of self-defense but conceding that the defense's theory would lead to the likelihood of a conviction of second-degree manslaughter or reckless homicide rather than murder. The trial court denied this motion.

On the third day of trial, following the Commonwealth's closing argument, the jury was sent to deliberate at approximately 4:48 p.m. At approximately 7:14 p.m., court was brought back in session as the jury made five requests to the court: (1) to rewatch the body-worn camera footage; (2) to

rewatch the video doorbell footage; (3) to have the difference between second-degree manslaughter versus reckless homicide explained in layman's terms; (4) to review photographs of the victim's vehicle showing the gunshot defects; and (5) to learn what time the first 911 call was made. The trial court informed the jury that it could not explain the difference between second-degree manslaughter and reckless homicide beyond what the jury instructions stated, and it also explained that it could not introduce any facts about the 911 call that were not introduced as evidence at trial. The trial court admitted that the photographs requested by the jury were inadvertently withheld and sent them back with the jury at that time. The jury rewatched both the body-worn camera footage and the doorbell footage in open court, using the same equipment as was used at trial. Around this same time, counsel was asked to approach the bench, as the court wished to discuss a disclosure about a juror's nondescript fear to a bailiff. No request was made by the juror, nor was specific information provided at that time regarding the nature of the juror's fear. Defense counsel failed to request any relief at this point. The jury continued deliberations.

At around 7:56 p.m., court was brought back into session when the trial court again discussed the juror's fear with counsel. This time, the trial court indicated that it had learned more about the juror who was in fear. After returning to deliberate, the juror in question had disclosed to a bailiff that, during voir dire, he was asked to reveal the name of a law enforcement officer he was related to. Because of this disclosure, the juror was afraid that

5

Haggard's family would be able to find out the identity of the juror and retaliate against the juror. Both parties expressed concern about bias and the potential for mistrial as counsel for both parties and the court pondered the situation together. Defense counsel suggested replacing the juror in question with an alternate but was advised that there were no longer any alternates, presumably because the alternates had already been dismissed without admonition to refrain from discussing the case. Defense counsel stated, "It's new territory for me, I don't know how to address it." The trial court offered, "or if it should be addressed at all." Defense counsel stated, "I don't think it should be address[ed]. I tend to agree with [the Commonwealth]." The Commonwealth stated, "I am concerned that there is a juror back there who is making a decision based on fear or intimidation. That affects the deliberations in favor of the defendant." The trial court stated that it did not "have any kind of indication that [it was] impacting deliberations at all as far as [the juror's] decision." Defense counsel stated, "thinking about it a little bit more, my concern . . . would be an [RCr[1]] 11.42 for us not asking for a mistrial. So that concerns me. I still think nothing is the thing to say." The Commonwealth asked for time to research it. The trial court added that it had no reason to believe that the jurors were not doing their job, and defense counsel agreed. The court and the parties agreed that drawing attention to the juror's fears

---

[1] Kentucky Rules of Criminal Procedure.

might lend credibility to those fears and collaboratively they chose not to confront the issue at that time.

At approximately 9:35 p.m., court was brought back in session to respond to requests by the jury to rewatch the body-worn camera footage and the video doorbell footage. The trial court noted that it was able to hear the footage more clearly on a personal portable speaker device than over the courtroom system. The trial court suggested to counsel that the jury could use the portable speaker to rewatch the videos instead of the courtroom system used during trial. Defense counsel did not object. At this point, the trial court also questioned counsel on how late they anticipated staying at the courthouse that night. The trial court indicated that, although it had no issues with staying, it suggested that they could break and return in the morning or wait for an initial verdict and continue the rest the following day, suggesting that, in its experience, it is better to not stay too late. Defense counsel opined that it would prefer to get a verdict that night and save the rest of the proceedings, if necessary, for the next day. The jury then proceeded to view the video footage using the portable speaker.

The court reconvened around 11:26 p.m., when the jury requested to rewatch the doorbell video. Out of the presence of the jury, the trial court requested counsel to approach the bench, to apparently discuss a note the court received regarding the juror with fears about retaliation. The trial court and counsel for both parties agree that the trial court should address the juror's concern by assuring the juror that he need not be afraid, as neither the

7

judge nor counsel had ever experienced or heard of retribution against a juror, aside from fictional accounts, i.e., movies, books, etc. Defense counsel suggested that the trial court write down the message and send it back to the jury so that "no one feels singled out." The trial court took defense counsel's suggestion and wrote its message on a note for the entire jury and copied the note for the record. The jury was brought back in the courtroom, received the note, and watched the requested video footage using the portable speaker.

At approximately 2:00 a.m., the jury informed the trial court that a unanimous verdict cannot be reached. Out of the presence of the jury, the trial court conferred with counsel to indicate that it did not intend to give an *Allen* charge[2] based on how late it was and how much time the jury spent deliberating, but that the trial court was open to discussion about it. Defense counsel agreed, but the Commonwealth requested an *Allen* charge, citing the nature of the case. The trial court then suggested that the jury be allowed to leave and come back with a fresh mind but stated that it did not intend to sequester[3] the jury. The Commonwealth stated that it did not intend to request sequestration of the jury. Defense counsel responded that it also was not asking for sequestration because it would not be agreeable to let the jury

---

[2] *See Allen v. United States*, 164 U.S. 492 (1896).

[3] RCr 9.66 provides that, "Whether the jurors in any case shall be sequestered shall be within the discretion of the court, except that in the trial of a felony charge, after the case is submitted for their verdict, they shall be sequestered unless otherwise agreed by the parties with approval of the court."

leave and return the following day. The court gave the jury the *Allen* charge, and the jury continued deliberations.

At approximately 2:15 a.m., the trial court brought counsel back to the courtroom and indicated that it saw exhaustion in the jury's faces and that, in its opinion, continuing deliberations would be futile. The trial court suggested checking in with the jury around 2:47 a.m.[4] to see the status of deliberations, and if they were still deadlocked, it would not require the jury to deliberate further. The Commonwealth asked if breaking and returning later in the morning was an option, to which the trial court replied, "well if the demand for sequestration was made, as it was, I don't intend to sequester the jury." Defense counsel once again indicated that it was not willing to break and return without sequestering the jury. The trial court reaffirmed that it would not sequester the jury because it believed the jury to be deadlocked. Ultimately, the trial court and the parties agreed that if a decision had not been reached by the 2:47 a.m. mark, it would permit the jury to cease deliberations.

At approximately 2:30 a.m., court reconvened, by request of the jury, to once again let the jury watch the body-worn camera video and the doorbell video. This was accomplished with the portable speaker.

At 3:15 a.m., the jury announced that it had reached a verdict, and at 3:17 a.m., the trial court read the jury's verdict finding Haggard guilty of murder.

---

[4] The jury would have been deliberating for 10 hours by that point.

The court adjourned for the night and reconvened the next afternoon for sentencing. Defense counsel moved for a judgment notwithstanding the verdict, which the trial court denied, finding sufficient evidence to support the verdict when viewing all inferences in favor of the Commonwealth. The jury recommended a sentence of twenty-eight years imprisonment. The trial court sentenced Haggard in accordance with this recommendation. Haggard now appeals his conviction to this Court as a matter of right. *See* KY. CONST. § 110(2)(b).

**ANALYSIS**

On appeal to this Court, Haggard first alleges that the courtroom created conditions which deprived him of a fair and impartial jury. Specifically, Haggard alleges that, because during some part of the trial, two rows of seating behind him were blocked off but none were blocked off behind the Commonwealth, he was predisposed to appearing guilty to the jury. He asserts that this bias appeared when one juror expressed fear of retaliation by Haggard or his family, setting a tone that portrayed Haggard as dangerous and prone to violence. Next, Haggard asserts that jury fatigue from the trial court's refusal to sequester resulted in an unjust verdict, and that the timing and administration of the trial court's *Allen* charge constituted coercion upon an already fatigued and vulnerable jury. Next, Haggard contends that the trial court exhibited judicial bias in offering a superior speaker system from chambers for the Commonwealth's video evidence, resulting in undue emphasis on such evidence. Lastly, Haggard alleges that the evidence was

10

insufficient to support a conviction of murder, and that the trial court erred by not dismissing the charge against him pursuant to KRS[5] 503.085.

## A. The seating configuration in the courtroom did not result in palpable error.

Haggard first contends that the seating arrangement of the courtroom, which at times had roped off two rows of seating directly behind the defense table but none behind the Commonwealth's table, deprived him of a fair and impartial jury.

Standard of Review

Because this issue is unpreserved, Haggard requests review under RCr 10.26. RCr 10.26 states,

> A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

To establish palpable error, Appellant must show "the probability of a different result or error so fundamental as to threaten his entitlement to due process of law." *Huddleston v. Commonwealth*, 542 S.W.3d 237, 245 (Ky. 2018) (quoting *Brooks v. Commonwealth*, 217 S.W.3d 219, 225 (Ky. 2007)). "On appellate review, our focus is on whether 'the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process.'" *Id.* (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006)). "For an error to be palpable, it must be easily perceptible, plain, obvious and readily

---

[5] Kentucky Revised Statutes.

11

noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (internal quotation marks omitted). "A palpable error 'must involve prejudice more egregious than that occurring in reversible error.'" *Id.* (quoting *Ernst v. Commonwealth*, 160 S.W.3d 744, 758 (Ky. 2005)). "A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings." *Id.* "Thus, what a palpable error analysis 'boils down to' is whether the reviewing court believes there is a 'substantial possibility' that the result in the case would have been different without the error." *Id.* (citing *Schoenbachler v. Commonwealth*, 95 S.W.3d 830, 836 (Ky. 2003)).

Discussion

During part of the trial, two rows of seating were roped off behind the defense table, but none were roped off behind the Commonwealth. Haggard contends that this prejudiced the jury and resulted in an unfair and partial jury. During voir dire, no rows were roped off and the jury pool was seated directly behind the defense table, with the defendant seated at the defense table with his attorneys. However, beginning with opening arguments, the court security team had, on its own accord, roped off the first two rows of seating behind the defendant.

Haggard argues that

[t]his clear division between [Haggard] and any individual to be sat behind him *could have* caused a reasonable juror to believe that [Haggard] had a high propensity for violence which required separation and security to those sitting too closely behind him. Alternatively, this partition *could have* caused a reasonable juror to believe that the severity of the alleged crimes or likelihood of guilt must be so high that he needed a larger margin of protection from

12

> attack by any aggrieved and emotional members of the audience, such as the victim's family.

(emphasis added). To show palpable error, one must show that manifest injustice has resulted from the error. However, Haggard fails to show that the seating arrangement *did* cause any influence on the jury. There is simply no evidence that the seating caused any impact on the jury's verdict. During voir dire, the jury itself sat directly behind Haggard, limiting the effect of any unintended message about Haggard's propensity for violence. Courts have found bolder situations to not be prejudicial to the defendant. In *Holbrook v. Flynn*, 475 U.S. 560, 571 (1986), the Supreme Court of the United States held that four armed uniformed state police guards taking up the first row of spectator seating behind defendants was not prejudicial, specifically stating that it was unlikely "to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." If armed law enforcement officers seated in the row directly behind the defendant are not prejudicial, neither is the blocking off of two rows behind the defendant for only part of the trial.

Further, defense counsel waived this claim of error by inviting it. "[I]nvited errors that amount to a waiver, *i.e.*, invitations that reflect the party's knowing relinquishment of a right, are not subject to appellate review." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 38 (Ky. 2011). Out of the presence of the jury, the trial court, *sua sponte*, called both the Commonwealth and defense counsel to the bench in the middle of the second day of trial and

13

stated that it wished to change the seating of the courtroom because it wished to make the number of blocked off seating the same behind both parties. Defense counsel was completely in agreement with waiting until the next day to reconfigure the seats, even though there were still hours left of trial for that day and expressed no urgency or requests regarding the seating. Defense counsel made no objections, nor did they move for a mistrial. At the very least, the defense counsel's acquiescence in waiting until the next day to reconfigure the seating demonstrates that defense counsel was not critically concerned about the prejudicial effect of the arrangement.

Waiver of this argument as invited is further supported by the fact that prior to the penalty phase, the trial court, *sua sponte* and before the jury was in the courtroom, addressed a probation officer who was sitting in the seat directly behind the Commonwealth. The trial court stated, "I had expressed . . . at least twice my concern *sua sponte* about the appearance of the barriers around the defendant and the guards around the defendant, and I thought the agreed-to cure was going to be that both front rows were going to be empty." Defense counsel did not object nor contest that the trial court's handling of the matter was not a proper "cure." Haggard now argues that the first two days "were crucial to eliminating all potential influences that might exist while the Commonwealth is presenting their theory of guilt." Yet, notably, defense counsel's reaction to the trial court's *sua sponte* discussion of the matter was not to move for a new trial but to agree to wait to address the issue. Haggard cannot have it both ways.

14

In sum, Haggard fails to demonstrate that the seating arrangement in the courtroom amounted to palpable error.

**B. The trial court's handling of the juror's fear of retaliation did not constitute palpable error.**

Haggard asserts that the juror who expressed fear of retaliation was evidence of an improperly influenced jury, and that this fear added to the prejudicial atmosphere of jury deliberations.

Standard of Review

Because this issue is unpreserved, Haggard requests palpable error review under RCr 10.26, as detailed above.

Discussion

A criminal defendant claiming the jury has been biased or prejudiced bears the burden of proving said bias or prejudice. *See Cook v. Commonwealth*, 129 S.W.3d 351, 357 (Ky. 2004). Appellant must prove both bias and prejudice resulting from bias. *See Clay v. Commonwealth*, 291 S.W.3d 210, 216 (Ky. 2008).

Here, Haggard fails to show bias or prejudice which would rise to the level of palpable error. To start, it is clear that the fear of retaliation the juror in question felt did not influence his verdict, as the jury still returned a unanimously guilty verdict. If the juror was fearful that a guilty verdict would beget retaliation, the juror still felt strongly enough that Haggard was guilty that he still returned a guilty verdict. This is the opposite of evidence of an improperly influenced jury — it indicates that this juror was sure of his guilty

15

verdict.  Nevertheless, this is not the argument that Haggard makes.  Instead, he argues:

> Coupled with the subsequent deadlock of the jury hours later, it can be reasonably inferred that the juror continuously voicing his fear of the Defendant and/or his family's actions heavily influenced that juror and likely caused some discomfort or unease to those around him.  While the Commonwealth could argue that a juror scared of the Defendant or his family should be viewed in his favor, which would only be in the event of a not guilty verdict, it speaks volumes to the circumstances and rationale which caused the juror to form such a strong belief.
>
> The previously described error concerning the layout of the courtroom predisposing the jury to view Defendant in a violent or guilty light is bolstered by the numerous comments of the juror citing fear of retaliation by [Haggard] or his family.  This error, combined with all other relevant factors which the Commonwealth may or may not have influence over when presenting their case to make Defendant and his family look like guilty, cold-blooded criminals, were ultimately detrimental to Defendant's fate in the case.  These circumstances deprived [Haggard] of his Constitutional right to a fair and impartial jury, such that reversal is warranted.

In sum, Haggard is arguing that the juror's fear is reflective of an already-improperly influenced jury, which is bolstering of his earlier argument that the seating arrangement in the courtroom was deleterious to his right to a fair and impartial jury.  To the extent that Haggard claims the juror expressing his fears influenced those around him and added to the alleged atmosphere of premature bias, Haggard fails to demonstrate any impact this had on the jury which would rise to palpable error.  Proving palpable error requires showing a manifest injustice.  *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006).  Mere speculation about any multitude of ways that the jury might have prematurely assessed the defendant's guilt falls short of proving that manifest injustice has occurred.  Manifest injustice is the "probability of a different result or error so

16

fundamental as to threaten a defendant's entitlement to due process of law." *Id.* Haggard does not explain any way in which the court mishandled the juror's fears, nor could he, considering defense counsel actively participated in crafting, and encouraged, the resolution reached by the trial court. Ultimately, this argument falls far short of palpable error.

### C. The trial court's refusal to sequester the jury did not result in an unjust verdict.

Haggard asserts that the trial court improperly influenced the jury because it refused to sequester the jury, so the jury ended up deliberating from 4:48 p.m. until 3:17 a.m. after having started the day at 9:00 a.m. Haggard asserts that requiring the jury to deliberate well into the next morning caused the jury exhaustion and led to an unjust guilty verdict. He contends that the "timing and administration of the *Allen* charge constituted coercion upon an already fatigued and vulnerable jury."

Standard of Review

Because this issue is unpreserved, Haggard requests palpable error review under RCr 10.26, as detailed above.

Discussion

Haggard argues that forcing the jury to stay and deliberate, instead of allowing the jury to break and sequestering the jury, caused the jury to be fatigued, and thus led to an unjust guilty verdict. In support, Haggard cites to *Tarrence v. Commonwealth*, 265 S.W.2d 40, 52 (Ky. 1953), in which the Court of Appeals held that "where a jury has gone through an all-day trial, keeping or permitting them to continue their deliberations practically all night without

17

interruption *might* result in an unjust verdict from tired minds." (emphasis added). In *Tarrence*, the case was given to the jury at 10:45 p.m. and the verdict was returned later that night at 4:35 a.m. *Id.* The deputy sheriff had asked the jury several times if they wished to continue their deliberations or go to a hotel for the night. *Id.* The jury chose to stay. *Id.* Ultimately, the *Tarrence* Court held that because "this was the express preference of the jury and there was no objection," there was no error. *Id.*

Here, while it was not the express preference of the jury to stay, there was no objection from defense counsel. The jury began the day at 9:00 a.m., received the case at 4:48 p.m., and returned a verdict at 3:17 a.m. The trial court engaged in several discussions with counsel about how late everyone intended to stay and let the jury deliberate. At 9:35 p.m., the trial court first discussed with counsel whether breaking and returning in the morning or waiting for an initial verdict and returning the next day would be the best option. The trial court indicated that it is best not to stay too late. Defense counsel declared their preference to get a verdict that night and save the rest for the next day. At 2:02 a.m., the jury informed the trial court that it could not reach a unanimous verdict. At that time, the trial court expressed its intent to not give an *Allen* charge based on how late in the night it was and how much time the jury had already spent deliberating. Defense counsel agreed, but the Commonwealth requested an *Allen* charge. The trial court again suggested breaking and returning the next day but indicated an intent not to sequester the jury during the break. The Commonwealth voiced that it

18

did not intend to request sequestration. Defense counsel stated that it also was not asking for sequestration but only because it was not agreeable to leaving and returning the next day. The trial court gave the jury an *Allen* charge, but soon after discussed with counsel that it only intended to allow the jury to deliberate until 2:47 a.m. unless the jury was making progress towards reaching a verdict by then. Defense counsel reaffirmed its commitment to not breaking without sequestration, to which the trial court again responded that it did not intend to sequester the jury. At around 2:30 a.m., the jury again requested to watch the video footage, and then, by 3:15 a.m., had reached a verdict.

In its post-trial order denying Haggard's motion for a new trial, the trial court elaborated:

> Contrary to Defendant's argument in his Motion, the Jury was sequestered the entire time between the Court giving the charge to deliberate and the return of their Verdict on the guilt phase of the trial. The Court indicated to counsel, outside the presence of the Jury, that it believed it would be best to allow the Jury to return home (with an admonition not to communicate about the case) and, after a rest, return for further deliberation. Defendant objected to allowing them to discontinue deliberations unless the Court arranged sequestration through hotel accommodations. The Court sustained Defendant's objection and stated it would not allow the Jury to separate or return home. The Court indicated that it did not intend to arrange hotel accommodations for sequestration because, given the hour and length of deliberations, it would be more inclined to declare a mistrial. Although this was discussed, Defendant did not object to the Jury continuing deliberations or move for a mistrial. Furthermore, later, when the Jury indicated that a unanimous verdict could not be reached, the Court informed all counsel (again, on the record, and in the presence of Defendant) that it intended to declare a mistrial. The Commonwealth objected and requested an *Allen* Charge. The Court indicated that it was reticent to do so, noting that it believed the jurors had endured about all that they could stand. Despite this, Defendant did not oppose the

19

Commonwealth's request for an *Allen* Charge, nor did Defendant otherwise move for a mistrial. Instead, the Court stated that it would give one charge to continue deliberations but that, in any event, the Court would not allow deliberations to continue much longer. The Court then gave the Jury a Charge pursuant to RCr 9.57. And again, Defendant did not object or present opposition to the Charge given. In fact, the Court expressly asked counsel for both parties if they had any objection to the charge given by the Court. Both counsel assented that they had no objection.

Nevertheless, Haggard now claims that the jury's fatigue resulted in an unjust verdict. Under palpable error review, it is difficult to see how Haggard believes that the length of deliberations resulted in manifest injustice when his counsel requested several times for the jury to stay and deliberate.

Decisions about how late to keep the jury are within the sound discretion of the trial court. In *Keller v. Commonwealth*, 20 S.W.2d 998, 1001 (Ky. 1929), our predecessor Court stated that:

It rested in the discretion of the trial court whether the case should be submitted to the jury at [midnight] or that they be held over night and submitted the next morning. It is the usual practice to secure an expression of the wish of the jury under such circumstances, and it is likely that was done here. But whether it was or not it does not appear that there was any abuse of discretion in the action of the court.

Here, we are not reviewing for an abuse of discretion standard of review but under a palpable error review. The trial court's actions would not meet an abuse of discretion standard under *Keller*, and it would certainly not amount to manifest injustice under a palpable error standard.

Similarly, Haggard argues that the trial court coerced the already fatigued and vulnerable jury by giving them an *Allen* charge. Haggard points out that the jury had been deliberating for over nine hours when the request

20

for an *Allen* charge was made and that the jurors were clearly exhausted by that point. In a review of the record, the trial court was conscientious and open to discussion about balancing the rights of the parties, being courteous of the jury, and conserving judicial resources in weighing its options to grant an *Allen* charge, letting the jury break with or without sequestration, or declaring a mistrial. In weighing these options, the trial court came to a compromise — one that defense counsel did not object to — to give the *Allen* charge but then set a plan to let the jury deliberate for an additional 45 minutes after the *Allen* charge was given. While it is true that deliberations continued after that 45-minute mark, it was extended only after the jury asked to see the video footage again — a sign that the jury was advancing in its deliberations. Ultimately, the jury deliberated for just over an hour after the *Allen* charge was given.

Haggard claims that "the lapse of an hour between the *Allen* charge and return of the verdict on an already fatigued and vulnerable jury is clearly indicative of influence and coercion, even if inadvertent due to the sensitivity of the jury from their fatigue." In support, Haggard cites to *Gray v. Commonwealth*, 480 S.W.3d 253, 272 (Ky. 2016), which held that "[t]he lapse in time between the trial court's allegedly coercive comment and the jury's deliberation may be a relevant consideration in a totality-of-the-circumstances review." The substance of the *Allen* charge given to the jury by the trial court in this matter is as follows:

> I know that you have put in great effort and time into trying to reach a verdict and you've worked very hard. I am going to ask that you continue for a while and I'm not at all pressuring you or trying to

21

force you to change your opinion. I just would like you to try given the fact that the trial is over and you've heard all of the evidence and you are in a position to deliberate, I would like you to deliberate a bit longer to see if it's possible, and I'll just give you what is the charge that I would give at a time like this and most of it you've heard before. But I just direct that you as jurors consult with one another and to deliberate with a view towards reaching an agreement if you can do so without doing violence to your own individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You've been at this a long time, I'm not asking you to go another nine hours or whatever. Just please do deliberate and try, and if it's futile, I will understand. But please do give it your effort, and I know that you are. Thank you.

Haggard fails to state how the above *Allen* charge was coercive. The charge given does not include coercive language but instead reassures the jury that they will not be forced to deliberate for much longer and reaffirms that each juror should stick steadfastly to their own convictions. It only encourages the jury to continue deliberating, not to return a verdict each did not fully believe in. After the verdict was read, each member of the jury was polled and asked if that was his or her verdict, to which each responded in the affirmative. Had an individual juror not supported the conviction, this was their time to speak up. Ultimately, Haggard fails to meet his burden in showing that the *Allen* charge was prejudicial or that allowing the jury to remain in deliberations was palpable error.

22

**D. The trial court's offering of a superior speaker to play audio from the Commonwealth's video exhibits did not constitute palpable error.**

Haggard argues that the trial court exhibited judicial bias in offering a superior speaker system from chambers for the Commonwealth's video evidence, resulting in undue emphasis on such evidence.

Standard of Review

Because this issue is unpreserved, Haggard requests palpable error review under RCr 10.26, as detailed above.

Discussion

During trial, all video exhibits were played over the court speaker system, which had somewhat poor audio quality. After the jury began deliberations and had already asked to rewatch the video evidence once, the trial court offered a speaker which it had tested in chambers and determined to have superior sound quality to the speaker used during the presentation of evidence. The jury used this speaker to watch the video evidence several times. Haggard's main argument is that the trial court playing the videos with a clearer speaker "placed undue emphasis on the evidence" and showed a judicial bias in favor of the Commonwealth's evidence.

Prior to playing the videos with the portable speaker, the trial court first consulted with counsel for both parties and informed them that it had tested the speaker in chambers and found it to be of superior sound quality. Neither party objected to using this speaker to play the audio from the videos for the jury. Defense counsel's only concern was that the sound timing match the

23

video, and after a brief testing, there were no objections or concerns about the audio and video being synced. The jury was then brought back into the courtroom. The trial court stated to the jury, "I have obtained a speaker that I'm hoping will help the audio quality. I think it will, we'll see. I don't know. Decide for yourselves whether it will, but we are going to try that."

Haggard argues that the trial court taking ownership for having found the better speaker "placed undue emphasis on the evidence such that the jury could believe that the trial court was endorsing the Commonwealth and its exhibit in a manner wherein they give such evidence more weight." The cases Haggard cites in support discuss allowing a jury to watch video footage in the deliberation room instead of in open court, resulting in undue emphasis on the evidence. However, they are inapplicable to this discussion because here there is no question that the videos were played in open court. Our case law has recognized that testimonial videos should be limited to being played only in open court due to the risk of undue emphasis. *See McAtee v. Commonwealth*, 413 S.W.3d 608, 627 (Ky. 2013). Here, the distinction between video evidence being testimonial or nontestimonial is not a concern, and so the cases addressing the effects of testimonial evidence on the minds of the jury are of little relevance.

Haggard's argument that the superior audio quality somehow altered the substance of the evidence to make it different than that heard at trial is also misguided. The jury watched the same videos as during trial. The only change in the delivery came from the use of an ordinary, common personal speaker. In

24

*Burkhart v. Commonwealth*, 125 S.W.3d 848, 850 (Ky. 2003), this Court found "no abuse of discretion in the slow motion replay or in letting the jurors assemble closely around the video monitor. Both acts merely allowed more careful observation of the events depicted on the surveillance video." The same is true here, as the speaker only aided in the juror's perception of the same evidence using commonly available technology that could have also been used to deliver the videos to the jury during trial had it been considered at that point. Under *Burkhart*, there would be no abuse of discretion, and here, there is certainly not palpable error.

Haggard also contends that using the speaker made the videos played unduly prejudicial because after hearing the audio on the superior speaker, the jury would assume that the audio encompassed all statements made, and if a statement was not heard with the superior speaker, the statement was not made. The reason why this distinction is important to Haggard is because his theory of self-defense hinges on whether he was being threatened by Lakiko. Haggard's concern is that the jury did not hear Lakiko making threats; therefore, the jury assumed that not hearing any threats meant that Lakiko did not make any threats.[6] "A jury is presumed to be composed of men of average intelligence." *Eaton v. Commonwealth*, 19 S.W.2d 218, 224 (Ky. 1929). The

---

[6] At trial, the Commonwealth notes that the responding officer, who testified that he was facing away from the doorbell camera, was heard clearly asking "who shot him?" on the camera, lending more credibility to the theory that, if no threats could be heard from Lakiko, it is because Lakiko did not make these threats. This assumes that Lakiko could not have made any threats in a quieter or softer tone than the responding officer or that Lakiko's positioning and physical barriers would have no effect on sounds made by Lakiko being picked up by the doorbell camera.

assumption reached by Haggard assumes that the jury, who had just observed an instance where sound quality clearly prevented every potential sound from being heard accurately, does not understand that sound otherwise made in the real world could be missing from an audio recording taken at that time. It was never represented to the jury that the portable speaker would make every sound clear, and ordinary understanding of audio recording dictates otherwise. A person of average intelligence understands that the quality of audio recording is subject to multiple factors, and the jury, who is presumed to be of average intelligence, is able to objectively weigh the implications of whether certain comments are or are not discernible from an audio recording.

Ultimately, Haggard fails to meet his burden of proving palpable error.

**E. There was sufficient evidence to support the jury's verdict.**

Lastly, Haggard contends that there was insufficient evidence to support a conviction of murder and that his motion for a directed verdict should have been granted. In a related argument, he further argues that the trial court erred in not dismissing the charges pursuant to KRS 503.085 when he filed his pretrial motion to dismiss.

Standard of Review

"On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Leavell v. Commonwealth*, 671 S.W.3d 171, 179 (Ky. 2023) (quoting *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991)). "So long as the Commonwealth

26

produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied." *Taylor v. Commonwealth*, 617 S.W.3d 321, 324 (Ky. 2020).

In reviewing the trial court's handling of a motion to dismiss pursuant to KRS 503.085 immunity, "[t]he correct standard of review in cases involving claims of immunity under KRS 503.085 is . . . whether there was a substantial basis for the trial court's findings." *Commonwealth v. Lemons*, 437 S.W.3d 708, 716 (Ky. 2014).

<u>Discussion</u>

Haggard argues that at trial, all elements of self-defense or defense of others were met, and that the Commonwealth did not meet its burden in refuting same, thus entitling him to a directed verdict:

> No evidence presented by either of the Commonwealth's experts conclusively supports the Commonwealth's theory of guilt, and in fact the evidence supports Wayne's theory of defense of himself and others. If the evidence relied upon to establish self-defense is contradicted or if there is other evidence from which the jury could reasonably conclude that some element of self-defense is absent, a directed verdict should not be given. *Townsend v. Commonwealth*, 474 S.W.2d 352 (Ky. 1971). However, the Commonwealth did not present any shred of evidence which would contradict the evidence relied upon in Appellant's self-defense and protection of others defense. Of all parties which the Commonwealth called during their case in chief, all of the parties' stories aligned and remained consistent with one another in such a manner that they be deemed credible and viewed in a favorable light.

"[T]his Court has previously explained, 'Rarely is a defendant relying upon self-defense entitled to a directed verdict. Only in the unusual case in which the evidence **conclusively** establishes justification and all of the elements of self-

27

defense are present is it proper to direct a verdict of not guilty.'" *Leavell*, 671 S.W.3d at 179.

The elements of using deadly force in self-defense are defined in KRS 503.050(2):

> (2) The use of deadly physical force by a defendant upon another person is justifiable under subsection (1) only when the defendant believes that such force is necessary to protect himself against death, serious physical injury, kidnapping, sexual intercourse compelled by force or threat, felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055.

The elements of defense of another are defined in KRS 503.070(2):

> The use of deadly physical force by a defendant upon another person is justifiable when:
> (a) The defendant believes that such force is necessary to protect a third person against imminent death, serious physical injury, kidnapping, sexual intercourse compelled by force or threat, or other felony involving the use of force, or under those circumstances permitted pursuant to KRS 503.055; and
> (b) Under the circumstances as they actually exist, the person whom he seeks to protect would himself have been justified under KRS 503.050 and 503.060 in using such protection.

Haggard explains that the evidence introduced at trial included the following:

> Without any testimony from the victim, and without any documentary evidence showing what exactly happened that night, the Commonwealth is left with the physical evidence from the scene of the incident, statements made by all involved parties, one semi-clear audio clip and a handful of experts making educated guesses as to what occurred based upon the scene and state of the victim.

Detective Bryan Cochran testified to the trajectory of the bullet and that Haggard was at least 6.19 feet away from Lakiko when he pulled the trigger.

Dr. Arabjiaf testified to the trajectory of the bullet once it hit Lakiko, testifying

28

that the bullets took a downward, left-facing path once it entered Lakiko's body, which supports both a theory that Lakiko was lunging up with a weapon and that Lakiko was crouched behind the driver's side door for protection. The jury was also presented with photographic evidence of what appeared to be brain matter below the car door window, perhaps indicating that Lakiko's head was lower than one might believe to be true if he were lunging up at Haggard from behind the car door to shoot. While testimony evidence from Troy, Jacob, Haggard, and Shamblin all indicated that Haggard was engaged in self defense or defense of others, the jury was entitled to weigh the credibility of these witnesses, all of whom were socially aligned with Haggard. "Deciding whose version to believe and weighing witness credibility is entirely within the jury's discretion." *Taylor v. Commonwealth*, 671 S.W.3d 36, 44 (Ky. 2023) (quoting *Hall v. Commonwealth*, 337 S.W.3d 595, 610 n.52 (Ky. 2011)).

Haggard argues that "[b]ased on the totality of the circumstances and the clear picture painted as to what occurred on the night of the incident through the consistent testimony of those present, [Haggard]'s justifiable belief *could be* easily inferred for purposes of a directed verdict." (emphasis added). Yet, Haggard's justifiable belief could likewise *not be* inferred from the evidence. The Haggard brothers initially approached Lakiko who was sitting alone in his car, minding his own business. The jury was at liberty to disregard witness testimony stating that Lakiko lunged at the Haggard brothers without provocation, considering that he was outnumbered, of a significantly smaller stature than the Haggard brothers, and that the Haggard brothers were under

29

the influence of alcohol at the time. After the shooting, there is video footage of Haggard stating "I did what I did. Sh*t happens. I overreacted." Haggard's testimony could have been received less credibly based on his claims that Lakiko was incessantly threatening to kill the Haggard brothers. These threats, if made, were indiscernible from the audio recording while other statements could be heard. Lastly, some of the witness testimony was contradictory, as there was inconsistency among the Haggard brothers and Shamblin about whether Lakiko specifically stated that he had a gun. Witness credibility assessments are exclusively in the purview of the jury, and it is clear that the jury weighed the evidence and disbelieved Haggard's theory of defense of self or others. Because there is more than a scintilla of evidence to support the conviction, the trial court acted properly in denying Haggard's motion for a directed verdict.

As for Haggard's claim that his motion to dismiss under KRS 503.085[7] immunity should have been granted, in *Rodgers v. Commonwealth*, 285 S.W.3d 740, 756 (Ky. 2009), we found the same type of review to be "purely academic":

> [W]e note that the precise mechanism for judicial implementation of KRS 503.085 is purely academic as to Rodgers because he has been tried and convicted by a properly instructed jury in a trial with no reversible error. In short, his self-defense claim has been thoroughly examined by both the trial judge under the directed verdict standard and the jury under the court's instructions and his entitlement to self-defense has been rejected. While the trial court's approach to the immunity issue was not the one outlined by this Court, it was

---

[7] KRS 503.085 states that "[a] person who uses force as permitted in KRS 503.050, 503.055, 503.070, and 503.080 is justified in using such force and is immune from criminal prosecution and civil action for the use of such force," subject to some exceptions not applicable here.

certainly sufficient and Rodgers suffered no discernible prejudice. Indeed if the trial court had divined the procedure outlined here, applying the probable cause standard would have produced the same conclusion, no entitlement to immunity and denial of Rodgers's motion to dismiss. Accordingly, there was no reversible error in the handling of the immunity determination.

Likewise, we need not accept Haggard's invitation to review his entitlement to immunity under KRS 503.085.

In sum, there was sufficient evidence to support the jury's verdict of guilt, and therefore review of the trial court's denial of Haggard's motion to dismiss is unnecessary under our precedent in *Rodgers*, 285 S.W.3d at 756.

## CONCLUSION

For all the foregoing reasons, we affirm the judgment of the Boone Circuit Court.

All sitting. Lambert, C.J.; Bisig, Conley, Goodwine, Keller, and Nickell, JJ., concur. Thompson, J., concurs in result only.

COUNSEL FOR APPELLANT:

Wilbur M. Zevely
Ryan M. Beck
Caitlin E. Klosowski
Busald Funk Zevely PSC


COUNSEL FOR APPELLEE:

Russell M. Coleman
Kentucky Attorney General

Joseph Crawford White
Assistant Attorney General